[Crim. No. 19837. Mar. 15, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JULIAN ZAPATA BARRAZA, Defendant and Appellant.

**COUNSEL**

Paul. Arthur Turner, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler and Robert H. Philibosian, Chief Assistant Attorneys General, S. Clark Moore, Assistant Attorney General, Shunji Asari, Frederick R. Millar, Jr., William R. Pounders, Theodora Berger, Randy S. Morrison-Bruck and Edward T. Fogel, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—We confront in this criminal appeal two separate issues: (1) the effect of what may be denominated a mini-*Allen* charge, i.e., a jury instruction declaring "If you fail to agree upon a verdict, the case will be tried before another jury . . ."; and (2) the proper test to be applied to the defense of entrapment.

Defendant appeals from his conviction on two counts of selling heroin (Health & Saf. Code, § 11352). The first count charged defendant with selling heroin to an undercover narcotics agent of the Los Angeles County Sheriff's Department on August 25, 1975. At trial, the agent testified that defendant sold her a yellow balloon containing heroin for $25 of county-advanced funds. Defendant, testifying in his own behalf, gave a different account of his interaction with the narcotics agent on that date, contradicting her testimony that a sale of heroin had occurred.

Count II charged a second sale of heroin on September 11, 1975; both the female agent and the defendant testified that the agent tried to contact defendant by telephoning the Golden State Mental Health Detoxification Center, where he worked as a patient care technician, several times during the three weeks between the dates of the two alleged heroin sale transactions. On September 11, the agent finally succeeded in speaking to defendant and asked him if he had "anything"; defendant asked her to come to the detoxification center. The two then met at the center and talked for some time—a few minutes according to the agent, more than an hour by the defendant's account.

The agent's version of this encounter described defendant as hesitant to deal because "he had done a lot of time in jail and he couldn't afford to go back to jail and . . . he had to be careful about what he was doing." She further testified that after she convinced defendant she "wasn't a cop," he gave her a note, to present to a woman named Stella, which read: "Saw Cheryl [the agent]. Give her a pair of pants [argot for heroin].

[signed] Cal." The agent concluded her testimony by stating that she then left defendant, used the note to introduce herself to the dealer Stella, and purchased an orange balloon containing heroin.

Defendant described a somewhat different pattern of interaction with the agent at their September 11th meeting. He related that he had asked her to come and see him because he was "fed up with her" and wanted her to quit calling him at the hospital where he worked because he was afraid she would cause him to lose his job. He insisted he told her during their conversation that he did not have anything; that he had spent more than 23 years in prison but now he had held a job at the detoxification center for four years, was on methadone and was clean, and wanted the agent to stop "bugging" him. He testified that the agent persisted in her efforts to enlist his aid in purchasing heroin, and that finally—after more than an hour of conversation—when the agent asked for a note to introduce her to a source of heroin he agreed to give her a note to "get her off . . . [his] back." According to the defendant, he told the agent that he did not know if Stella had anything, and gave her a note which read: "Saw Cheryl. If you have a pair of pants, let her have them."

After final argument, the case was submitted to the jury late on Thursday afternoon, May 6, 1976. The jury began deliberating the next morning, continued its deliberations throughout that day, and resumed the following Monday at 9 a.m. At 10:45 a.m., the jury reported that it had reached a verdict on the second count but was hopelessly deadlocked on the first count. Responding to questions posed by the trial judge, the foreman of the jury advised the court that three ballots had been taken, the numerical split was nine to three, no progress was being made on resolving that division, and there was no reasonable possibility the jury would arrive at a verdict on the first count. The judge then delivered the following charge:

"All right, ladies and gentlemen of the jury, I am going to give you an additional instruction. This is not to be taken by you as any more or less important than any other instruction. Just regard it along with the rest.

"It is eminently desirable that if you reasonably can, you agree upon a verdict. For the parties involved, the case is an important one, and its presentation to you has involved expense to both sides. If you fail to agree upon a verdict, the case will have to be tried before another jury selected in the same manner and from the same source as you were chosen. There

is no reason to believe that the case will ever be submitted to a jury more competent to decide it.

"Of course, by pointing out to you the desirability of your reaching a verdict, the court is not suggesting to any of you that you surrender conscientious convictions of what the truth is and of the weight and effect of all the evidence. It does, however, wish to call to your attention that in most cases absolute certainty cannot be expected and that, while each of you must decide the case for yourself and not merely acquiesce in the conclusion of your fellow jurors, you should examine the questions submitted to you with candor and frankness, and with proper deference to and regard for the opinions of each other. It is your duty, after full deliberation and consideration of all of the evidence, to agree upon a verdict, if you can do so without violating your individual judgment and your conscience.

"You may be as leisurely as good conscience dictates in further deliberation.

"I now ask that you go back and retire for further deliberation at this time."

The jurors then resumed their deliberations. After one hour they returned to the courtroom requesting that the defendant's testimony be reread in its entirety. The record was reread and the jury continued to deliberate until it returned at 2:20 p.m. with verdicts of guilty on both counts. The record does not disclose if any of that period included time for lunch.

I

■ The issue posed by defendant's conviction on count I is the effect of the mini-*Allen* charge given to the jury when it reported—after more than one full day of deliberations—that it was hopelessly deadlocked as to the first count.

Our recent opinion in *People* v. *Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997], ruled impermissible the *Allen* or "dynamite" charge, a jury instruction designed to "blast" a verdict out of a deadlocked jury. Although we were confronted in *Gainer* with a full *Allen* charge—including the more highly prejudicial portion consisting of a direct admonition to minority jurors—we expressly held that it was error

for the jury to be instructed that "the case must at some time be decided." As we said in *Gainer,* "It is simply not true that a criminal case 'must at some time be decided.' The possibility of a hung jury is an inevitable by-product of our unanimous verdict requirement. Confronted with a mistrial, the People retain the authority to request dismissal of the action. (Pen. Code, § 1385.) Moreover, this option is frequently exercised, as the criminal bar knows, when the prosecution concludes that its inability to obtain a conviction stemmed from deficiencies in its case. Thus the inconclusive judgment of a hung jury may well stand as the final word on the issue of a defendant's guilt." We concluded that "an instruction which implies that a hung jury will assuredly result in a retrial misstates the law . . . ." (Fn. omitted.) (*Id.,* at p. 852.)

We expressly made our holding in *Gainer* retroactive to all cases not final as of the date of that opinion; it is therefore clear that the trial judge herein erred in instructing the jury that "If you fail to agree upon a verdict, the case will be tried before another jury . . . ." We must now determine whether such error requires reversal of defendant's conviction on count I.

The Attorney General contends that defendant acquiesced in the giving of the erroneous instruction because the court informed the prosecution and the defense, "I am going to give the Allen blockbuster-type instruction and see if I can get them off the dime." The court then asked if there was any objection to that and defense counsel replied: "No. Whatever Your Honor feels. It is immaterial to me." It is claimed the erroneous instruction was thus invited by the defense and may not be asserted to reverse the conviction.

In *People* v. *Graham* (1969) 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153], we considered the effect of an express acquiescence in an erroneous instruction and concluded: "In the absence of a clear tactical purpose, the courts and commentators eschew a finding of the 'invited error' that excuses a trial judge from rendering full and correct instructions on material questions of law. . . . Accordingly, if defense counsel suggests or accedes to the erroneous instruction because of neglect or mistake we do not find 'invited error'; only if counsel *expresses a deliberate tactical purpose* in suggesting, resisting, or acceding to an instruction, do we deem it to nullify the trial court's obligation to instruct in the cause." (Italics added.) We noted in particular the legislative command set forth in section 1259—and repeated in section 1469—of the Penal Code that "instructions which affect the substantial rights of a

defendant should be subject to review, even though his counsel, through neglect or mistake, has failed to object to them." (*Graham,* at pp. 319-320.) We have subsequently reaffirmed our holding in *Graham.* (See *People* v. *Mosher* (1969) 1 Cal.3d 379, 393 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Tidwell* (1970) 3 Cal.3d 82, 87 [89 Cal.Rptr. 58, 473 P.2d 762].)

The record herein does not in any way reflect a tactical decision. Defense counsel's remark, "It is immaterial to me," suggests, to the contrary, that the acquiescence derived from neglect, mistake, or inattention rather than from a deliberate tactical choice. It is evident that the conscious choice required by *Graham* was not expressed; thus the Attorney General's claim of invited error must be rejected.

■ The Attorney General further maintains that the giving of the mini-*Allen* charge herein was harmless error. In *Gainer,* we discussed the prejudicial effect of erroneously instructing the jury that "the case will have to be retried." Although we declined to adopt a per se rule of reversal, we cautioned that courts must remain cognizant of the "significant danger that the verdict will be influenced by a false belief that a mistrial will necessarily result in a retrial" when examining "all the circumstances under which the charge was given to determine whether it was reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 . . . .)" (*Gainer,* 19 Cal.3d at p. 855.) We further elucidated the proper application of this standard by declaring that "when the statement is the central feature of instructions given to a deadlocked jury" such standard "presumably would be met, as there would be little to indicate that the heightened potential for prejudice had not been realized." (*Id.,* at p. 856, fn. 20.)

The mini-*Allen* instruction erroneously given herein was the central feature of instructions given to a deadlocked jury and thus involves the heightened potential for prejudice we recognized in *Gainer.* Indeed, the judge himself voiced the expectation that the "blockbuster-type instruction" would "get them off the dime." We must therefore find the error prejudicial unless there are affirmative indications that persuade us this heightened potential was not realized.

Such indications are arguably present in the fact that the jury (1) continued to deliberate for two or three hours after it heard the mini-*Allen* charge, and (2) demonstrated that the deliberations were

properly focused on the evidence adduced during the trial when it requested that portions of the testimony be reread. We cannot, however, conclude that these factors suffice to dispel the presumption of prejudice created when a deadlocked jury is given the erroneous instruction at issue.

The jury had evinced a division of opinion; after long deliberations and three separate ballots, the jurors found themselves hopelessly deadlocked in a nine-to-three split. Though the jurors apparently set about their task as conscientiously as possible after being urged to pursue their deliberations, they approached that task infected with misinformation that could very likely have exerted a significant influence on the outcome of the deliberative process. We cannot discount the substantial pressure to decide caused by the erroneous perception that "since some jury, sooner or later, must decide this case one way or the other, and since we're as well-equipped to do so as any future jury is likely to be, we may as well finish the task we've begun."

The pervasive influence of such misinformation is further compounded when, as here, the jury charge refers to the expense involved in trying a case. We observed in *Gainer* that reference to the expense and inconvenience of a retrial is irrelevant to the issue of a defendant's guilt or innocence and is thus impermissible. (*Gainer,* at p. 852, fn. 16.) That the reference here did not link the notion of expense to a prospective retrial is immaterial, for the link is obvious and will naturally be inferred by the jurors once the subject is introduced. It is not so much the irrelevance of such a reference that is troubling, however, as the additional pressure to decide thus created. Consideration of expense "may have an incalculably coercive effect on jurors reasonably concerned about the spiraling costs of government." (Note, *The Allen Charge: Recurring Problems and Recent Developments* (1972) 47 N.Y.U. L.Rev. 296, 304.) The improper reference to expense herein thus augments the substantial, if subtle, pressure created by the improper instructions concerning the need for retrial. Although these erroneous instructions may not constitute a direct admonition to the minority, they have for all practical purposes much the same effect, particularly when given in tandem.

We therefore hold that the erroneous instructions given herein were prejudicial under the standards set forth in *Gainer,* and defendant's conviction on count I must be reversed.

## II

■ Defendant urges that his conviction on the second count must be reversed because the trial court erred in failing to instruct the jury *sua sponte* on the defense of entrapment. His contention requires that we reexamine the entrapment doctrine to determine the manner in which the defense must be raised.

Though long recognized by the courts of almost every United States jurisdiction,[1] the defense of entrapment has produced a deep schism concerning its proper theoretical basis and mode of application. The opposing views have been delineated in a series of United States Supreme Court decisions. The court first considered the entrapment defense in *Sorrells* v. *United States* (1932) 287 U.S. 435 [77 L.Ed. 413, 53 S.Ct. 210, 86 A.L.R. 249]. The majority held that entrapment tended to establish innocence, reasoning that Congress in enacting the criminal statute there at issue could not have intended to punish persons otherwise innocent who were lured into committing the proscribed conduct by governmental instigation. This focus on whether persons were "otherwise innocent" led the majority to adopt what has become known as the subjective or origin-of-intent test under which entrapment is established only if (1) governmental instigation and inducement overstep the bounds of permissibility, and (2) the defendant did not harbor a preexisting criminal intent. Under the subjective test a finding that the defendant was predisposed to commit the offense would negate innocence and therefore defeat the defense. Finally, because entrapment was viewed as bearing on the guilt or innocence of the accused, the issue was deemed proper for submission to the jury.

Justice Roberts wrote an eloquent concurring opinion, joined by Justices Brandeis and Stone, in which he argued that the purpose of the entrapment defense is to deter police misconduct. He emphatically rejected the notion that the defendant's conduct or predisposition had any relevance: "The applicable principle is that courts must be closed to the trial of a crime instigated by the government's own agents. No other issue, no comparison of equities as between the guilty official and the

---

[1] The defense appears to have first been asserted by Eve, who complained, when charged with eating fruit of the tree of knowledge of good and evil: "The serpent beguiled me, and I did eat." (Genesis 3:13.) Though Eve was unsuccessful in asserting the defense, it has been suggested that the defense was unavailable to her because the entrapping party was not an agent of the punishing authority. (Groot, *The Serpent Beguiled Me and I (Without Scienter) Did Eat—Denial of Crime and the Entrapment Defense*, 1973 U.Ill.L.F. 254.)

guilty defendant, has any place in the enforcement of this overruling principle of public policy." (*Id.,* at p. 459 [77 L.Ed. at p. 426].) Because he viewed deterrence of impermissible law enforcement activity as the proper rationale for the entrapment defense, Justice Roberts concluded that the defense was inappropriate for jury consideration: "It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law." (*Id.,* at p. 457 [77 L.Ed. at p. 425].)

In *Sherman* v. *United States* (1958) 356 U.S. 369 [2 L.Ed.2d 848, 78 S.Ct. 819], the majority refused to adopt the "objective" theory of entrapment urged by Justice Roberts, choosing rather to continue recognizing as relevant the defendant's own conduct and predisposition. The court held that "a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." (*Id.,* at p. 372 [2 L.Ed.2d at p. 851].) Justice Frankfurter, writing for four members of the court in a concurring opinion, argued forcefully for Justice Roberts' objective theory: "The courts refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about conviction cannot be countenanced." (*Id.,* at p. 380 [2 L.Ed.2d at p. 855].) He reasoned that "a test that looks to the character and predisposition of the defendant rather than the conduct of the police loses sight of the underlying reason for the defense of entrapment. No matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society. . . . Permissible police activity does not vary according to the particular defendant concerned . . . ." (*Id.,* at pp. 382-383 [2 L.Ed.2d at p. 857].) "Human nature is weak enough," he wrote, "and sufficiently beset by temptations without government adding to them and generating crime." (*Id.,* at p. 384 [2 L.Ed.2d at p. 858].) Justice Frankfurter concluded that guidance as to appropriate official conduct could only be provided if the court reviewed police conduct and decided the entrapment issue.

The United States Supreme Court recently reviewed the theoretical basis of the entrapment defense in *United States* v. *Russell* (1973) 411 U.S. 423 [36 L.Ed.2d 366, 93 S.Ct. 1637], and once again the court split five votes to four in declining to overrule the subjective theory adopted in *Sorrells.*

The principle currently applied in California represents a hybrid position, fusing elements of both the subjective and objective theories of entrapment. In *People v. Benford* (1959) 53 Cal.2d 1, 9 [345 P.2d 928], this court unanimously embraced the public policy/deterrence rationale that Justices Roberts and Frankfurter had so persuasively urged. In doing so, we ruled inadmissible on the issue of entrapment the most prejudicial inquiries that are allowed under the subjective theory, i.e., evidence that the defendant "had previously committed similar crimes or had the reputation of being engaged in the commission of such crimes or was suspected by the police of criminal activities . . . ." (*Id.,* at p. 11.)[2] In *Patty* v. *Board of Medical Examiners* (1973) 9 Cal.3d 356, 363-364 [107 Cal.Rptr. 473, 508 P.2d 1121], we reiterated the public policy basis for the defense, characterizing it as "crucial to the fair administration of justice." (*Id.,* at p. 364.) Despite the lessons of *Benford* and *Patty,* however, this court has continued to maintain that entrapment depends upon where the intent to commit the crime originated. (See, e.g., *People* v. *Sweeney* (1960) 55 Cal.2d 27, 49 [9 Cal.Rptr. 793, 357 P.2d 1049]; *People* v. *Francis* (1969) 71 Cal.2d 66, 78 [75 Cal.Rptr. 199, 450 P.2d 591]; *People* v. *Moran* (1970) 1 Cal.3d 755, 760 [83 Cal.Rptr. 411, 463 P.2d 763].)

Chief Justice Traynor, dissenting in *Moran* (1 Cal.3d at pp. 764-765), in an opinion joined by two other justices of this court, recognized that in thus departing from the rationale adopted in *Benford,* we have seriously undermined the deterrent effect of the entrapment defense on impermissible police conduct. He reasoned that attempts to fix the origin of intent or determine the defendant's criminal predisposition divert the court's attention from the only proper subject of focus in the entrapment defense: the dubious police conduct which the court must deter. ■ The success of an entrapment defense should not turn on differences among defendants; we are not concerned with who first conceived or who willingly, or reluctantly, acquiesced in a criminal project. What we do care about is how much and what manner of persuasion, pressure, and cajoling are brought to bear by law enforcement officials to induce persons to commit crimes. As Chief Justice Warren observed, the function of law enforcement manifestly "does not include the manufacturing of crime." (*Sherman* v. *United States* (1958) *supra,* 356 U.S. 369, 372 [2 L.Ed.2d 848, 851].) Even though California courts do not permit introduction of the highly prejudicial evidence of

---

[2]Justice Schauer, for the entire court in *Benford,* declared that "Entrapment is a defense not because the defendant is innocent but because, as stated by Justice Holmes [citation], 'it is a less evil that some criminals should escape than that the Government should play an ignoble part.'" (*Benford,* at p. 9.)

subjective predisposition allowed in jurisdictions following the federal rule, our more limited focus on the character and intent of the accused is still misplaced and impairs our courts in their task of assuring the lawfulness of law enforcement activity.

Commentators on the subject have overwhelmingly favored judicial decision of the issue by application of a test which looks only to the nature and extent of police activity in the criminal enterprise. (See, e.g., LaFave & Scott, Handbook on Criminal Law (1972) pp. 371-373; authorities cited in *State* v. *Mullen* (Iowa 1974) 216 N.W.2d 375, 381; authorities cited in Park, *The Entrapment Controversy* (1976) 60 Minn. L.Rev. 163, 167, fn. 13.) Professor Kamisar observed that only two law review articles in the past 25 years have favored the subjective test. (Kamisar et al., Modern Criminal Procedure (4th ed. 1978 Supp.) p. 119.) The Model Penal Code has adopted an objective test (Model Pen. Code (Proposed Official Draft 1962) § 2.13(1); see also Nat. Com. on Reform of Fed. Crim. Laws, Final Rep.—Proposed New Fed. Crim. Code (1971) § 702(2)), and in recent years several state courts (see *Grossman* v. *State* (Alaska 1969) 457 P.2d 226; *People* v. *Turner* (1973) 390 Mich. 7 [210 N.W.2d 336]; *State* v. *Mullen* (Iowa 1974) *supra,* 216 N.W.2d 375) and legislatures (see N.D. Cent. Code, § 12.01-05-11 (1976); N.H. Rev. Stat. Ann., § 626:5 (1974); Pa. Stat. Ann., tit. 18, § 313 (Purdon 1973); Haw. Rev. Stat., § 702-237) have recognized that such a test is more consistent with and better promotes the underlying purpose of the entrapment defense. Such support for the position no doubt derives from a developing awareness that "entrapment is a facet of a broader problem. Along with illegal search and seizures, wire tapping, false arrest, illegal detention and the third degree, it is a type of lawless law enforcement. They all spring from common motivations. Each is a substitute for skillful and scientific investigation. Each is condoned by the sinister sophism that the end, when dealing with known criminals or the 'criminal classes,' justifies the employment of illegal means." (Donnelly, *Judicial Control of Informants, Spies, Stool Pigeons, and Agent Provocateurs* (1951) 60 Yale L.J. 1091, 1111.)

For all the foregoing reasons we hold that the proper test of entrapment in California is the following:[3] was the conduct of the law enforcement agent likely to induce a normally law-abiding person to

---

[3]The wording of this test is derived from the proposed new federal criminal code (Nat. Com. on Reform of Fed. Crim. Laws, Final Rep.—Proposed New Fed. Crim. Code (1971) § 702(2)) and Chief Justice Traynor's dissenting opinion in *People* v. *Moran* (1970) *supra,* 1 Cal.3d 755, 765.

commit the offense? For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime.

■ Although the determination of what police conduct is impermissible must to some extent proceed on an ad hoc basis, guidance will generally be found in the application of one or both of two principles. First, if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established. An example of such conduct would be an appeal by the police that would induce such a person to commit the act because of friendship or sympathy, instead of a desire for personal gain or other typical criminal purpose. Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment. Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go undetected, an offer of exorbitant consideration, or any similar enticement.[4]

■ Finally, while the inquiry must focus primarily on the conduct of the law enforcement agent, that conduct is not to be viewed in a vacuum; it should also be judged by the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand. Among the circumstances that may be relevant for this purpose, for example, are the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission. (See *Grossman* v. *State* (Alaska 1969) *supra,* 457 P.2d 226, 230.) We reiterate, however, that under this test such matters as the character of the suspect, his

---

[4]There will be no entrapment, however, when the official conduct is found to have gone no further than necessary to assure the suspect that he is not being "set up." The police remain free to take reasonable, though restrained, steps to gain the confidence of suspects. A contrary rule would unduly hamper law enforcement; indeed, in the case of many of the so-called "victimless" crimes, it would tend to limit convictions to only the most gullible offenders.

predisposition to commit the offense, and his subjective intent are irrelevant.[5]

On the record of this case the trial court erred in failing to instruct the jury *sua sponte* on the defense of entrapment.[6] Defendant was entitled to such an instruction under the standards set forth in *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913], in which we made clear that a duty to instruct *sua sponte* arises when there is substantial evidence supportive of a defense that is not inconsistent with the defendant's theory of the case.

Though controverted by the People, there is substantial evidence herein supportive of an entrapment defense, even under the subjective test previously followed. Defendant's testimony, if believed, tends to establish that he was a man who, after a long history of drug addiction and criminal behavior, was making a sincere effort to gain control of his life and to function responsibly in his community. He had held a steady job for some four years, during which time he managed to become completely free of heroin use by participating in a methadone maintenance program. His characterization of the course of conduct between himself and the undercover narcotics agent is consistent with his contention that he was a past offender trying desperately to reform himself but was prevented from doing so by an overzealous law enforcement agent who importuned him relentlessly until his resistance was worn down and overcome.

Further, such a defense is not inconsistent with the defendant's theory on the second count. His defense of denial did not extend to the inculpatory *act* alleged—providing the agent with a note to facilitate her heroin purchase transaction with another—but only to the *intent* with which such act was committed. He claimed only that he did not intend to participate in a heroin sale when he provided the agent with the note. He does not subvert his position in arguing, "and irrespective of my intent, the overzealous law enforcement conduct directed at me constitutes entrapment." Chief Justice Traynor made it clear for this court, without

---

[5]Because the test of entrapment we adopt herein is designed primarily to deter impermissible police conduct, it will be applicable, except for the present defendant, only to trials that have not yet begun at the time this decision becomes final.

[6]In view of its potentially substantial effect on the issue of guilt, the defense of entrapment remains a jury question under the new test. However, for the reasons stated by Chief Justice Traynor in his dissenting opinion in *People* v. *Moran* (1970) *supra,* 1 Cal.3d 755, 765-766, three members of this court (Justices Mosk, Tobriner, and Newman) are of the view that claims of entrapment should be exclusively for the trial courts to decide subject to appropriate appellate review. (See also *People* v. *D'Angelo* (1977) 401 Mich. 167 [257 N.W.2d 655].)

dissent in *People* v. *Perez* (1965) 62 Cal.2d 769, 775 [44 Cal.Rptr. 326, 401 P.2d 934], that a defendant need not admit his guilt, or even commission of the act, to raise a defenue of entrapment.

■ In the circumstances of this case the issue of entrapment was not submitted to the jury under any other instructions. Accordingly, the court's error in failing to instruct *sua sponte* on this defense was prejudicial, and the conviction on count II must be set aside. (Cf. *People* v. *Sedeno* (1974) *supra,* 10 Cal.3d 703, 720-721.)[7]

The judgment is reversed.

Bird, C. J., Tobriner, J., Manuel, J., and Newman, J., concurred.

.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in that portion of the majority's opinion which holds that defendant's conviction on count I should be reversed because of the prejudicial "mini-*Allen*" instruction erroneously given to the jury.

I respectfully dissent, however, from that portion of the majority's opinion which establishes a new test for the defense of entrapment.

As the majority concedes, in determining the existence of an entrapment, the United States Supreme Court has consistently rejected the "objective" ("hypothetical person") test which the majority adopts in favor of the "subjective" ("origin of intent") test. In *Sorrells* v. *United States* (1932) 287 U.S. 435 [77 L.Ed. 413, 53 S.Ct. 210, 86 A.L.R. 249], *Sherman* v. *United States* (1958) 356 U.S. 369 [2 L.Ed.2d 848, 78 S.Ct. 819], and recently in *United States* v. *Russell* (1973) 411 U.S. 423 [36 L.Ed.2d 366, 93 S.Ct. 1637], the high court has approved and reapproved the "subjective" test. Following this lead, the federal courts and the courts of the overwhelming majority of states, including California, apply the "subjective" test, thereby keeping attention properly focused on the unique interrelationship of the police and the particular defendant who is asserting the defense of entrapment.

---

[7]Because there will be a new trial on both counts, we need not reach defendant's contention that the court erred in failing to instruct *sua sponte* that evidence of his oral admissions should be viewed with caution. (See *People* v. *Beagle* (1972) 6 Cal.3d 441, 455, fn. 4 [99 Cal.Rptr. 313, 492 P.2d 1].)

The majority now proposes to ban consideration of the particular defendant and replace him with a hypothetical "normally law-abiding person" who is described as "a person [who] would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully." (*Ante*, p. 690.) The briefest reflection reveals the difficulties inherent in this definition. The individual who has *never* committed a criminal act can safely be categorized as a "normally law-abiding person" since presumably his unblemished record is proof of his ability to resist temptation. However, what of the individual who has transgressed in the past either once or several times? Is he no longer *"normally* law-abiding"? Is "normally" synonymous with "generally"? If it may be drawn at all, the line between "normally law-abiding" individuals and "others" is not so easily fixed as the majority suggests.

The fallacy underlying the majority's thesis, of course, is that in the very real world of criminal conduct there are no hypothetical people. To attempt to judge police conduct in a vacuum is to engage in a futile and meaningless exercise in semantics. It is the recognition of this precise fact that has restrained the United States Supreme Court from discarding the subjective test whereby attention is pointed at the particular defendant rather than at some imaginary or fictitious person. The majority abandons the actual for the hypothetical. It thereby substitutes the unreal for the real, with unnecessary complications that inevitably result therefrom.

Further, by adopting an "objective" test, the majority does not really eliminate the "subjective" test. Even if the jury makes a finding adverse to the defendant pursuant to the "objective" test, the defendant may still presumably argue entrapment to the jury using the "subjective" standard to negate intent. The question of what the defendant intended is always relevant. Indeed, in the present case defendant admitted commission of the act. He denied only the requisite intent. The majority ignores entirely this problem of the double assertion of the entrapment defense.

The issue of entrapment is a factual matter, the determination of which is of critical importance to both parties. Regardless of any salutary effect which a trial court opinion might have on police administration, the matter is properly entrusted to the jury and should remain within its province.

The judgment as to count II should be affirmed.

**CLARK, J.,** Dissenting.—The most significant question presented by this case is whether this court should adopt the "hypothetical-person" ("objective") test of entrapment.

The test now applied in California, in all but seven of the other states, and in the federal courts is the "origin-of-intent" ("subjective") standard. This test focuses, quite properly, upon the guilt of the particular defendant, asking whether he was predisposed to commit the crime charged. If he was ready and willing to commit the offense at any favorable opportunity, then the entrapment defense fails even if the police used an unduly persuasive inducement.

The guilt of the particular defendant is irrelevant under the hypothetical-person test. It focuses instead upon the conduct of the police. If the police use an inducement likely to cause a hypothetical person to commit the crime charged, then the fact that the particular defendant was ready and willing to commit it does not defeat the entrapment defense. The evil of the hypothetical-person test is apparent —it leads to acquittal of persons who are in fact guilty. By focusing on police conduct rather than the defendant's predisposition, it creates a risk of acquitting dangerous chronic offenders.

That risk is strikingly illustrated by the facts of this case. The evidence would support the conclusion that defendant is one of the most cynical manipulators of the criminal justice system imaginable, that he abused the trust placed in him as an employee of a drug detoxification program to sell heroin to the patients with whom he worked, nullifying the program's slight chances of success and wasting countless thousands of tax dollars, that he initially refused to sell heroin to the deputy solely because he suspected she was an undercover officer, and that, before finally agreeing to make the sale through his wife, he sought to immunize himself by "entrapping" the deputy into the conduct he now relies upon as the basis of his entrapment defense. If the factfinder takes this view of the evidence, but also concludes the officer's conduct would have induced a hypothetical person to commit the offense, defendant goes free.

The majority respond by quoting Justice Holmes' observation that "it is a less evil that some criminals should escape than that the Government should play an ignoble part." (*Ante,* p. 688, fn. 2, quoting *Olmstead* v. *United States* (1928) 277 U.S. 438, 470 [72 L.Ed. 944, 953, 48 S.Ct. 564, 66 A.L.R. 376] (Holmes, J., dis.).) With deference to Justice Holmes, that is a false dichotomy. It is simply not true that society must choose between

freeing criminals and tolerating official misconduct. Take the case in which an officer uses an unduly persuasive inducement but the defendant is ready and willing to commit the crime at any favorable opportunity. Society can and should insist upon both the criminal's being convicted and the officer's being disciplined. To assume that the officer will not be disciplined is but another instance of the majority's "curious cynicism concerning the rule of law in our society" which I have elsewhere decried. (See, e.g., *People* v. *Cook* (1978) 22 Cal.3d 67, 102 [148 Cal.Rptr. 605, 583 P.2d 130] (Clark, J., dis.).)

The minority justices of the United States Supreme Court who have advocated the hypothetical-person test have argued that its adoption would increase public respect for the criminal justice system. (See, e.g., *Sherman* v. *United States* (1958) 356 U.S. 369, 380 [2 L.Ed.2d 848, 855, 78 S.Ct. 819] (Frankfurter, J., conc.).) However, the hypothetical-person approach is no way to achieve this respect. The public is, understandably, not offended by conviction of a defendant found—beyond a reasonable doubt and by unanimous vote of 12 citizens—to have been ready and willing to commit the crime charged. But the public will be offended by the adoption of an entrapment defense that ignores culpability and seeks to control police conduct by acquittal of professional criminals. As Justice Macklin Fleming has observed: "Each time the criminal process is thwarted by a technicality that does not bear on the innocence or guilt of the accused, we trumpet abroad the notion of injustice; and each time a patently guilty person is released, some damage is done to the general sense of justice." (Fleming, The Price of Perfect Justice: The Adverse Consequences of Current Legal Doctrine on the American Courtroom (1974) p. 9.)

Bernard E. Witkin, beyond question the foremost commentator on California law, expressed the same sentiment when he recently addressed himself to the historic contribution of the United States Supreme Court during the period when Earl Warren was Chief Justice. His subject was " 'The Second Noble Experiment of the Century' conceived in altruism, and dedicated to the principle that technical forms of criminal procedure are more important than the substance of guilt or innocence of the accused." What Mr. Witkin has to say is always worthy of attention but his remarks on this occasion are particularly noteworthy because this court appears to see itself as keeper of the flame that might otherwise have died with the passing of the Warren era. (See, e.g., *People* v. *Pettingill* (1978) 21 Cal.3d 231, 252-254 [145 Cal.Rptr. 861, 578 P.2d 108] (Clark, J., dis.).)

"We begin with a simple and tragic admission: That there is a rising rate of crime and a falling rate of conviction and punishment for crime. And we are frequently told by bitter critics that the responsible agency is the judiciary; that the Courts have become increasingly concerned with barren technicalities of criminal procedure, and have lost sight of the primary objective of the criminal law. [¶] Now none of us needs to be reminded that a system of criminal justice exists not just for the protection of the innocent but for the punishment of the guilty; and that only by consistent apprehension and conviction of the murderer, the burglar, the arsonist, the rapist, the drug-peddler, and other . . . predators that infest our society, can the system justify itself in the eyes of our people. We are therefore in deep trouble if, as these critics would have us believe, the judges of our state and federal courts are frustrating law enforcement by placing burdensome restrictions on arrest, production of evidence, and trials."

After making it clear that he considers these criticisms justified with regard to the Warren court, Witkin concludes by saying: "The cases I have discussed, and many others, demonstrate the weird and wonderful solicitude of thin majorities of our highest court of the Warren era for the professional and nonprofessional criminal. Serenely confident, with a full head of steam, the court repeatedly found new and exciting grounds upon which to reverse the convictions for major crimes on records which overwhelmingly established guilt. And the nation's legal scholars and students writing in law school reviews, deluged us with extravagant praise for these decisions, referring to them—in what is surely the most preposterous misclassification ever made—as decisions establishing and protecting civil liberties." (Witkin, *The Second Noble Experiment of the Twentieth Century* (Sept.-Nov. 1977) Prosecutor's Brief 42-45.)

Whatever else one may say of the Warren Court, it refused to take the step the majority of this court take today. Indeed, in *Sherman v. United States, supra,* 356 U.S. 369, 376-378 [2 L.Ed.2d 848, 853-854], Chief Justice Warren himself wrote the majority opinion in which the court declined to reconsider its adherence to the origin-of-intent test. With today's decision this court outdoes its mentor in rendering guilt irrelevant.

The judgment should be affirmed.

Respondent's petition for a rehearing was denied April 19, 1979. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.