Filed 10/30/25  P. v. Stinson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C101829 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE014612) |
| v. | |
| ERIC CHARLES STINSON, | |
| Defendant and Appellant. | |

Defendant Eric Charles Stinson was caught in a sting operation aimed at identifying online child sex predators.  As part of that operation, an undercover agent set up a profile for a fictional girl named "Maria" and listed her age as 18.  Defendant initiated contact with Maria and engaged in a sexually charged conversation with her, during which Maria revealed that she was only 13 years old.  Notwithstanding this revelation, defendant continued to exchange sexually explicit messages with her and arranged to meet her for a sexual encounter.

After a jury trial, defendant was found guilty of contacting a minor with the intent to commit a sex crime; arranging a meeting with a minor with the intent to engage in sexual conduct; sending harmful or obscene material to a minor; and attempting to induce

1

a minor to appear in child pornography. The trial court suspended imposition of sentence on all four counts and placed defendant on probation, subject to terms and conditions.

On appeal, defendant argues the trial court erred in (1) refusing his request for a jury instruction on entrapment, and (2) failing to apply Penal Code[1] section 654 to his sentence. Finding no error, we affirm the order of probation with a minor modification.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Prosecution's Case*

Special Agent Maraea Toomalatai was assigned to the Department of Justice's Sexual Predator Apprehension Team. In August 2021, she was involved in an undercover operation aimed at identifying online child predators. As part of that operation, Agent Toomalatai created an online profile for a dating application called "Skout." Skout required users to be at least 18 years old to create profiles, but it did not require users to verify their age. As a result, Agent Toomalatai testified that it was not uncommon for minors to create profiles on Skout.

In the Skout profile that she created, Special Agent Toomalatai posed as "Maria Tamayo" also known as "Mari Sweetie Pie," age 18, and described herself as "[l]ooking for a good time." Agent Toomalatai provided a cellphone number and two photos. Only one of the photos showed a face; it depicted fellow Special Agent Caitlyn Thomas, chosen for her "youthful appearance," edited to smooth her skin and make her appear younger.

On August 23, 2021, defendant, who was 53 years old at the time, "liked" Maria's profile picture and sent her a text message stating, "Hello, Maria. How are you, sexy?" The next day, Special Agent Toomalatai, as "Maria," responded, "Thank you. What you up to?" A few minutes later, defendant sent a photograph of himself and asked what she was doing. Maria replied that she was "[j]ust chilling while you look sexy." Defendant

---

[1]      Undesignated section references are to the Penal Code.

2

asked where Maria was located and asked her to send a "pic." Maria told defendant she was in "Rancho [Cordova]" and sent defendant the photograph of Special Agent Thomas that was used for the Skout profile. Defendant responded, "I see, not far."

Maria then messaged, "What are you into?. . . . I'm open for anything," adding that she was not looking for a commitment and was "just trying to have fun." Defendant responded, "I love fun" and "I'm very sensual and sensual [*sic*] and oral, LOL." Maria replied, "LOL, I love it." Defendant messaged, "Me too[,] sucking on clits, LOL," and asked whether she wanted to "get together." Defendant added that he "live[d] alone" and "[had] a pool."

Several minutes later, Maria responded, "Sorry. I was getting out of the shower. You got me so hot and wet." Defendant responded, "Lovely. Need any help?" and added, "Lick you dry, I will." Defendant then sent a photo of the Cookie Monster from Sesame Street with a message, "I'm gonna slap that ass, then eat that cookie."

Shortly thereafter, defendant sent a text message, "Hmm, I can come get you if you like," to which Maria replied, "Love to have you taste me." Defendant asked if she wanted to get together and messaged, "If not, then I'm gonna go check on this job." He also added, "And, yes, I wanna taste you bad." Maria answered, "I'm in for a quickie if you want to pick me up." Defendant texted a moving image (or GIF) of a cow making licking motions with its tongue.

Defendant asked, "How long we have?" Maria replied, "Do you like head?" referring to oral copulation. He responded, "Yes. Love it" and asked for her address so he could pick her up. He then sent a text message asking her if she smoked marijuana and drank (alcohol), and then another message stating, "[m]y cock, baby" accompanied by a picture of his penis. Maria replied, "I do both, smoke, drink, fuck. I ride all night. I'm young and smooth." Defendant sent a GIF of a female exposing her naked breasts and vaginal area, and told Maria that he grew marijuana and made his own whiskey. Maria asked, "I don't know if you would be into me, though." Defendant texted, "You

3

look sexy. I'm sure you are fine, sexy," to which she replied, "I'm young but I'm still grown." Defendant texted, "You're soft, smooth," "Yummy," and "Rub you all over." Defendant again offered to come get Maria and, after more sexually charged messages, asked her to send photographs of her body.

At that point, after about 35 minutes of texting, Maria made the "age drop."[2] She messaged, "I wanna be real with you. It's okay if you say no. I'm 13, but I'm emancipated and about to be 14." Defendant responded, "Hmm," and then, "Wow, you get here, we can but not gonna pick you up." He then suggested she hail a ride using a ride-sharing service like Uber, followed almost immediately by a text message stating, "Hmm. Man, I was excited." Maria replied, "I'm living in a hotel right now, but I don't have a ride." Defendant again asked her to "send pics."

Maria responded, "If you bring the weed and drink, I'm down to smoke [and] fuck." He texted back, "You get here, I will give you weed," and then added, "And suck and fuck." After that, defendant offered to send her money through "Cash App"— presumably to pay for an Uber—followed by another request for a "pic" of "nipples and body."

A few minutes later, Maria told defendant that she was trying to get a ride to his house from a friend, noting, "I don't have Cash App because I'm 13, LOL." Defendant reiterated that he had "whiskey and lots [of] weed." He texted, "Come ride papa," and suggested they could swim in his pool naked.

Maria messaged, "I want you to eat me, and I will break your dick, LOL." Defendant asked if he should send his address, and Maria responded, "I ride you so hard, baby." Defendant sent texts inquiring when she would arrive, requesting pictures of her

---

[2]     Special Agent Toomalatai explained that the age drop is the moment Maria disclosed that she was 13 years old.

4

body, and asking if she had ever "done anal." Maria replied that she had and was willing if he was "into it."

Shortly thereafter, Maria texted that her friend could not give her a ride and asked defendant to pick her up. Defendant responded, "I'm just hesitant," then suggested he could pick her up at a light rail station. When Maria agreed, defendant asked, "And you are not associated with any law enforcement, are you?" Maria responded, "Whaaa, hell no . . . . I don't fuck with them, but I get why you asked."

Defendant and Maria exchanged additional text messages about how to meet at the light rail station. During the course of this exchange, defendant continued to request that she send naked pictures of her body. Defendant also asked, "How big [are] your nipples?" and sent sexually explicit images, including a GIF of a male penis penetrating a naked woman's anus.

When defendant arrived at the light rail station, he drove into the parking lot and motioned for Maria (portrayed by Special Agent Thomas) to enter his vehicle. As he did so, Sacramento Sheriff deputies detained him.

After his arrest, defendant was interrogated by Detective Daniel Heaton. The jury saw and heard the videotaped interrogation. During the conversation, defendant said that he traveled to the light rail station because he was "curious" after "Maria" told him she was "emancipated," but he did not intend to have sex with a 13 or 14-year-old girl because "that's not who I am." He told the detective that he hoped Maria was lying about her age.

Defendant admitted that he sent Maria a picture of his penis and that he asked her to send naked pictures of herself to him. He also admitted to telling Maria that he was going to do sexual things to her. Defendant told the detective that he was "ashamed of [him]self," that he "made a bad decision," and felt "embarrassed." However, defendant also claimed that once he saw Maria in person, and saw that she was "really super young," he "wasn't gonna let her get in [his] car."

5

B. *Defense Case*

Defendant testified in his own defense. He claimed that he contacted Maria because her dating profile reflected "she was 23, and she had a very pretty picture, and she said she was looking for fun." He claimed that the picture on her Skout profile was not the same one (of Special Agent Thomas) that was sent to him, although he did acknowledge receiving the one Maria sent during their conversation.

Defendant conceded that at some point Maria told him that she was "13, 14, but . . . emancipated," which he took to mean that he "was dealing with an adult still." He thought she was "playing games" with him because "it wasn't adding up." Based on her Skout profile, the fact that she was living in a hotel, and the adult nature of their conversation, defendant believed she was an adult. Defendant testified that his intention when meeting Maria at the light rail station was to "see who she was and make a friend and see what was going on." At the station, he saw a "young person" standing by a light pole, but did not think it was the person in the photographs that were sent to him. When he called out her name, he was immediately arrested. That "was the first time it dawned on [him] that [Maria] was a minor."

C. *Verdict and Sentencing*

The district attorney filed an amended information charging defendant with four felony counts: contacting or communicating with a minor with the intent to commit a sexual offense (§ 288.3; count one); arranging a meeting with a minor with the intent to commit a sexual offense (§ 288.4, subd. (b); count two); distributing harmful matter to a minor (§ 288.2, subd. (a)(2); count three); and attempting to induce a minor to pose or model for sexual photos or video (§§ 664, 311.4, subd. (c); count four).

After a nine-day trial, a jury found defendant guilty as charged. On August 9, 2024, the trial court suspended imposition of sentence and placed defendant on formal probation for two years. As a condition of probation, the trial court ordered appellant to

6

serve 364 days in county jail.  Defendant filed a timely notice of appeal on August 14, 2024.

DISCUSSION

I

*Instruction on Entrapment*

Defendant claims the trial court erred in failing to instruct the jury on the defense of entrapment.  We disagree.

A.     *Additional Background*

Before trial, the prosecution filed a motion in limine to exclude any reference to "entrapment" absent an Evidence Code section 402 evidentiary hearing (402 hearing).  The defense objected and requested a 402 hearing, arguing that there was sufficient evidence to support an entrapment instruction.  The trial court held a 402 hearing on the entrapment issue.  At the hearing, Special Agent Toomalatai testified about her creation of the "Maria" profile on the Skout dating application and the subsequent text messages that Maria exchanged with defendant.  Agent Toomalatai's testimony at the 402 hearing was detailed and generally consistent with her trial testimony.  The primary differences were that Agent Toomalatai's trial testimony described several additional examples of sexually explicit text messages between defendant and Maria, from before and after the age drop.

After the 402 hearing, the trial court granted the prosecution's motion in limine, ruling that the evidence was insufficient to support an entrapment defense.  During the trial and after the close of evidence, the trial court denied the defense's renewed request for an entrapment instruction.

B.     *Standard of Review*

Upon request by the defendant, a trial court is required to instruct on a defense that is supported by substantial evidence.  (*People v. Moore* (2002) 96 Cal.App.4th 1105, 1116; *People v. Miceli* (2002) 104 Cal.App.4th 256, 267)  Substantial evidence in this context does not mean "*any* evidence . . . no matter how weak[,]" but rather " ' "evidence

7

from which a jury composed of reasonable [people] could have concluded" ' that the specific facts supporting the instruction existed." (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677; accord, *People v. Larsen* (2012) 205 Cal.App.4th 810, 823-824.)  Since entrapment is an affirmative defense that the defense must prove by a preponderance of the evidence, (*People v. Mower* (2002) 28 Cal.4th 457, 480; CALCRIM No. 3408), substantial evidence to support an entrapment defense means evidence sufficient for a reasonable jury to find the defendant has shown the defense to be more likely than not.  (Judicial Council of Cal., Crim. Jury Instns. (2025) Bench Notes to CALCRIM No. 3408.)

On appeal, we independently review the trial court's refusal to give a requested defense instruction.  (*People v. Larsen, supra*, at p. 824; accord, *People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.)

C.      *Analysis*

"In California, the test for entrapment focuses on the police conduct and is objective.  Entrapment is established if the law enforcement conduct is likely to induce a *normally law-abiding person* to commit the offense." (*People v. Watson* (2000) 22 Cal.4th 220, 223.)  "For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully.  Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime." (*People v. Barraza* (1979) 23 Cal.3d 675, 690 (*Barraza*).)

"Although the determination of what police conduct is impermissible must to some extent proceed on an ad hoc basis, guidance will generally be found in the application of one or both of two principles.  First, if the actions of the law enforcement

agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established. An example of such conduct would be an appeal by the police that would induce such a person to commit the act because of friendship or sympathy, instead of a desire for personal gain or other typical criminal purpose. Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment. Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go undetected, an offer of exorbitant consideration, or any similar enticement." (*Barraza, supra*, 23 Cal.3d at p. 690, fn. omitted.)

The *Barraza* court was careful to note, however, that police may "take reasonable, though restrained, steps to gain the confidence of suspects" and to assure them that they are not being " 'set up.' "[3] (*Barraza, supra*, 23 Cal.3d at p. 690, fn. 4.) Ruses, stings, and decoys are permissible tactics to expose illicit activity and do not constitute entrapment so long as the police (or their agents) do not pressure the suspect by overbearing conduct. (*Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 568-569; *Barraza,* at p. 690; see *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1094, 1100 [asking an exotic dancer if her next dance would involve "more skin" was not entrapment].)

Defendant argues the trial court erred in refusing to give an entrapment instruction because the many "sexually-charged" messages before the age drop, combined with the

---

[3] Our high court also clarified that while the inquiry focuses on the conduct of law enforcement, that conduct is "not to be viewed in a vacuum." (*Barraza, supra*, 23 Cal.3d at p. 690.) Rather, the conduct of the law enforcement agent must be judged by the effect it would have on a normally law-abiding person under similar circumstances. (*Ibid*.) Among the circumstances that may be relevant for this purpose are (1) the transactions preceding the offense, (2) the suspect's response to the agent's inducements, (3) the gravity of the crime, and (4) the difficulty of detecting its commission. (*Ibid*.)

undercover agent's use of the term "emancipated," stimulated defendant's "sexual desire" and enticed him into committing a crime he did not originally intend to commit. Defendant argues that a rational jury could conclude that the agent's conduct made the crime so "unusually attractive" that it was likely to induce a normally law-abiding person to commit the offense. We are not persuaded.

First, as the trial court correctly observed, it was defendant who initiated and set the tone of the conversation when he first messaged Maria and asked, "How are you, sexy?" Further, when Maria told defendant that she was "open for anything" and "just trying to have fun," it was defendant who escalated the sexual nature of the conversation by texting that he was "very sensual and . . . oral," followed immediately thereafter by his comment about "sucking on clits" and his desire to "get together."

At the time defendant initiated the conversation, defendant may have believed that Maria was an adult based on her Skout profile and the age requirements for the dating application,[4] but this does not change the fact that defendant was the one who steered the conversation toward sexual activities, presumably because he wanted to have a sexual encounter with Maria. Law enforcement did not coerce or pressure defendant into having the sexually charged conversation.

Further, even if defendant initially assumed Maria was an adult based on her Skout profile, the evidence shows that defendant had reason to question that assumption well before the age drop. At the beginning of their conversation, in response to defendant's request for a "pic," Maria sent defendant the photograph of Special Agent Thomas that had been edited to make her appear younger. The trial court found that this edited image made the "girl appear quite young, around adolescent age," and that the image, "in the judgment of your normal law-abiding adult, would place the girl anywhere from 11 to 16

---

[4]    There is a conflict in the evidence concerning what was included in the undercover agent's Skout profile.

years of age." Defendant himself admitted during his police interrogation that, in the photographs sent to him, Maria appeared to be "somewhere between 13 and 18." Maria also referred to herself as "young and smooth" in the text messages she sent to defendant. Thus, even though Maria did not immediately inform defendant of her "true" age, it was apparent that she was markedly young and possibly a minor. Nevertheless, defendant persisted in leading the sexually explicit conversation with her, without making any attempt to verify her age.

Crucially, after Maria disclosed that she was only 13 years old, defendant did not disengage. Even though Maria gave defendant a clear opportunity to withdraw, stating, "It's okay if you say no," defendant did not tell her that he no longer wanted to have sex with her. Rather, he told her, "we can," but that he was no longer willing to pick her up. He suggested she hail a ride using a rideshare service and repeated his request that she "send pics." It was at this point that Special Agent Toomalatai sought to clarify defendant's intentions. Maria texted defendant that she "was down to smoke [and] fuck" if he brought "the weed and drink." Defendant responded, "You get here, I will give you weed," then added, "And suck and fuck." After that, he offered to send her money, and messaged, "Come ride papa."

This evidence shows that, despite the age revelation, defendant willingly continued discussing plans to meet Maria for a sexual encounter. After Maria's age was revealed, he became "hesitant" to pick her up—presumably to minimize his chances of being caught—but he demonstrated no similar hesitancy about meeting a 13-year-old girl for sex. Yet defendant was conscious that what he was doing was wrong, as demonstrated by his asking whether she was associated with law enforcement. Under the circumstances of this case, we conclude the trial court did not err in denying defendant's request for an instruction on entrapment.

*People v. Fromuth* (2016) 2 Cal.App.5th 91, on which the trial court relied, is instructive. In *Fromuth*, as part of an investigation into online predators, an officer

posted an advertisement pretending to be "Maria," a " '[y]oung cutie looking for a hookup.' " (*Id*. at p. 96.) The officer left the age field blank because he intended to pose as a minor, and the advertisement would have been removed if he listed an age younger than 18 years. (*Id*. at pp. 96-97.) When the defendant, age 30, responded to the advertisement, the officer revealed that Maria was only 15 years old. (*Id*. at p. 97.) Defendant initially responded with an email that suggested Maria do something else besides " 'hookup,' " so the officer terminated the communication. (*Id*. at p. 111.) However, about an hour later, the defendant reinitiated contact and provided his email address so that they could maintain contact. (*Id*. at pp. 97-98, 111-112.) Later that day, the officer sent an email asking the defendant if he was " 'still interested.' " (*Id*. at p. 111.) The defendant expressed interest and asked, " 'You think you want to see me?' " (*Id*. at p. 97.) The officer sought to clarify, asking, " 'If you are down and not into games. We both know what this is about.' " (*Ibid*.) When defendant did not give a straight answer, the officer asked, "[A]re you down or do you just want to talk?" (*Ibid*.) The defendant indicated that he was "down" and asked how they should meet. (*Ibid*.) Over the next hour, Maria and the defendant exchanged a flurry of emails concerning the specifics of where they would meet, where they would have sex, and what sex acts Maria would be willing to do. (*Ibid*.)

The *Fromuth* court held that these facts did not support an instruction on entrapment. The court explained that the officer did not pressure the defendant to pursue a " 'hookup' " with Maria. (*People v. Fromuth, supra*, 2 Cal.App.5th at p. 112.) Rather, it was the defendant who reinitiated the conversation about a " 'hookup.' " (*Ibid*.) The court likewise rejected that the officer's conduct, including his use of flattery and sexual language, was the type of conduct that would have induced a normally law-abiding person to arrange a " 'hookup' " with a 15-year-old girl. (*Id*. at pp. 111-112.) "His conduct did nothing more than present defendant with the opportunity to commit the offense." (*Id*. at p. 111.) " '[A] person who steals when given the opportunity is an

12

opportunistic thief, not a normally law-abiding person.' [Citation.] Similarly, a person who arranges to have sex with a child when given the opportunity is an opportunistic sexual predator, not a normally law-abiding person." (*Ibid*.; see *People v. Federico* (2011) 191 Cal.App.4th 1418, 1421-1424 [no entrapment where the decoy "merely provided an opportunity for defendant to spend time alone with a 12-year-old girl in an empty house"].)

The same is true here. A normally law-abiding man would not have continued to pursue a prospective sexual encounter with "Maria" after she revealed that she was only 13 years old, regardless of any claim to be "emancipated." Nothing the undercover agent did, before or after the age drop, constituted "overbearing conduct" that would have "pressured" a normally law-abiding man to arrange to have sex with a 13-year-old girl.[5] The agent's conduct merely presented defendant with an opportunity to commit the crimes. Because substantial evidence did not support the defense of entrapment, the trial court correctly refused the instruction.

## II

### *Section 654*

Defendant also argues the trial court violated section 654's proscription against double punishment by failing to stay the sentences for all but one of the four offenses because they all were based on the same act. The People argue that section 654's bar against multiple punishment does not apply to a probationary order, and therefore defendant's claim is unripe. We agree with the People.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one

---

[5] Indeed, the only possible "enticement" after the age drop was the prospect of having sex with a 13 year old, which should not entice a normally law-abiding adult.

provision. . . ." (§ 654, subd. (a).) By its terms, section 654 prohibits multiple punishments based on the same "act or omission," which has been construed to include not only a single discrete physical act but also a course of conduct encompassing several acts pursued with the same criminal intent or objective. (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) The "proper method of eliminating the punitive consequences of multiple convictions [is] to stay execution of sentence for all but one conviction" arising out of the same act or omission. (*People v. Pearson* (1986) 42 Cal.3d 351, 360, disapproved on other grounds in *People v. Vidana* (2016) 1 Cal.5th 632, 650-651; *People v. Deloza* (1998) 18 Cal.4th 585, 591-592.)

Defendant argues that section 654 applies because all four of his offenses arose from the same indivisible course of conduct engaged in with a single intent and objective. However, section 654 applies only to double punishment, not double conviction. (*People v. Ortega* (2000) 84 Cal.App.4th 659, 666.) Here, the trial court suspended imposition of sentence and placed defendant on formal probation. Probation is an "act of grace and clemency designed to allow rehabilitation" and therefore is not within the ambit of section 654's proscription against double punishment. (*People v. Stender* (1975) 47 Cal.App.3d 413, 425, abrogated on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 237, overruled in part on other grounds in *People v. Fontenot* (2019) 8 Cal.5th 57, 70; accord, *People v. Wittig* (1984) 158 Cal.App.3d 124, 137; *People v. Lofink* (1988) 206 Cal.App.3d 161, 168.) Accordingly, defendant's claim is not ripe for adjudication. The trial court can consider any double punishment concerns when and if defendant violates his probation. (*Wittig,* at p. 137; *People v. Martinez* (2017) 15 Cal.App.5th 659, 669, disapproved on other grounds in *People v. Ruiz* (2018) 4 Cal.5th 1100, 1122, fn. 8; see § 1203.2, subd. (c).)

Upon our review of the oral pronouncement of sentence, however, we note an additional issue that requires our attention. Specifically, when imposing the period of confinement in county jail as a condition of probation, the trial court stated, "This is to

14

apply to Count One only.  [¶]  No time is imposed for Count Two, and no additional time is imposed for Counts Three and Four, so as to preserve time in the event [defendant] violates his probation."  The apparent intent of including this language was to link the county jail time to one of the counts.  In our view, this was unnecessary and improper. The text of section 1203, subdivision (b)(3), shows that the Legislature intended for probation to be determined with respect to "the particular case," rather than on a count-by-count basis.  (§ 1203, subd. (b)(3).)

Nevertheless, we conclude remand for resentencing is unnecessary because it is clear the trial court intended to grant probation in the case as a whole.  The court explicitly suspended imposition of sentence on all four counts, placed defendant on formal probation, and imposed county jail time as a condition of his probation. (§ 1203.1, subd. (a)(2).)  The additional pronouncement, purportedly tying the county jail term to count one, therefore, is of no effect.  (§ 1203.2, subd. (c); *People v. Howard* (1997) 16 Cal.4th 1081, 1084, 1087.)  Accordingly, we shall modify the order of probation to remove the extraneous language.

## DISPOSITION

The order of probation is modified to strike the following language:  "This is to apply to Count One only.  [¶]  No time is imposed for Count Two, and no additional time is imposed for Counts Three and Four, so as to preserve that time in the event [defendant] violates his probation."  As modified, the order of probation is affirmed.  The trial court is directed to prepare an amended minute order consistent with this opinion.


　　　　　　　　　　　　　　　　　　　　　　\s\　　　　　　　　　　　　,
　　　　　　　　　　　　　　　　　　　　　　Krause, J.

We concur:


　　　　\s\　　　　　　　　　,
Earl, P. J.


　　　　\s\　　　　　　　　　,
Wiseman, J.*

---

\*　　　Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.