Filed 2/29/24  P. v. Valete CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARK VALETE,<br><br>    Defendant and Appellant. | A167600<br><br>(San Francisco City &<br>County Super. Ct.<br>Nos. CRI20002624,<br>233982) |

After a jury convicted defendant Mark Valete of one count of felony meeting a minor for lewd purposes and felony contact with a minor for sexual offense, the trial court sentenced defendant to the midterm of two years but suspended execution of sentence and placed defendant on probation, subject to numerous terms and conditions.

On appeal, defendant (1) contends the trial court committed prejudicial error in failing to instruct on entrapment; (2) contends he should be awarded 20 days' conduct credit pursuant to Penal Code section 4019;[1] (3) challenges two probation conditions that restrict his Internet and social networking usage as unconstitutionally overbroad; and (4) challenges a "no-pornography" condition as unconstitutionally vague.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The Attorney General concedes, and we agree, defendant should have been awarded conduct credits; the two Internet conditions are impermissibly overbroad; and the no-pornography condition is impermissibly vague as written. Accordingly, we remand the matter with directions to the trial court to correct the minute order to reflect the correct conduct credits and to strike or modify the challenged probation conditions. In all other respects, we affirm.

## BACKGROUND

The San Francisco County District Attorney filed an information charging defendant with felony meeting a minor for lewd purposes (§ 288.4, subd. (b)—count 1); felony contact with a minor for sexual offense (§ 288.3, subd. (a)—count 2); and misdemeanor arranging to meet with a minor for lewd purposes (§ 288.4, subd. (a)(1)—count 3).

At trial, San Francisco Police Sergeant Christopher Servat explained the "Internet Crimes Against Children Unit" "investigate[s] individuals who use the Internet to what we call sexual[ly] exploit[] . . . minors," "investigate[s] individuals that attempt to meet children online to have sexual contact with them, and then we also investigate individuals that download, distribute, and possess child pornography." As part of its investigations, the unit will perform "undercover operations," in which officers "pose as underage children on social media sites or chat sites and basically find individuals that are trying to target children for sexual exploitation."

Sergeant Servat set up an account on Grindr, "a geosocial networking and online dating application geared towards gay, bi, trans, and queer

2

people,"[2] on a department-issued phone. Servat explained that with Grindr, "you need to put in an age," of at least 18 years old. However, there is "no verification" of the information provided, meaning "anyone, any child, anyone in the world, can just create an account." Servat typically would make up a birthdate that made him very recently 18 years old. He uses photos from younger officers, when they were children, as his profile picture. The policy is to not make initial contact, but instead, to wait to see who contacts him.

In February 2020, Sergeant Servat set up a profile with the username, "Nico Here" with a smiley face emoji, and a profile picture from a fellow officer when he was 14 years old. Servat listed "Nico's" age as 18 years old, and the age was visible on the profile.

After Sergeant Servat set up the "Nico profile," defendant made contact and sent a picture of himself. Defendant asked "Nico," "U have a nice ass?" Servat, pretending to be "Nico," replied, "I guess lol." When defendant asked for another picture, Servat sent defendant a different picture of the same police officer at age 14. Defendant asked for an "Ass pic?" To which Servat responded, "Nah I don't send pics like that." Servat asked defendant how old he was, and defendant responded, "60." When Servat stated, "You don't look 60," defendant replied, "I'm late 20[,] [¶] You?" Servat asked defendant why he said he was 60, and defendant stated, "It was a joke." Servat responded, "K," and then "I'm not exactly 18. . . ." Defendant asked, "How old are you?" and Servat told defendant he was 14 years old. Defendant then asked Servat

---

[2] The application "makes use of a mobile device's geolocation, a feature of smart phones and other devices, which allows users to locate other users who are nearby. This is accomplished through a user interface that displays a grid of representative photos of men, arranged from nearest to furthest away. Tapping on a picture will display a brief profile for that user, as well as the option to chat, send pictures, and share one's precise location."

where he was located, but before responding to the question, Servat asked, "Is my age . . [.] ok with u"? Defendant replied, "Yea. [¶] Dnt matter[.] [¶] Where u at[.] [¶] How bout you . . [.] does it matter? [¶] ? [¶] No? [¶] Yea?" Servat replied, "I'm cool w it. [¶] I live in sf." Defendant asked if Servat wanted to meet, and if so, where and when. Servat stated Thursday, and that he was "usually off school around 2:30." Over the course of texting on Grindr, defendant repeatedly asked for "ass" pictures from Servat, who refused. The two then switched to "WhatsApp."

Servat explained he switched to WhatsApp, "another online app, messaging app, that enables you to message with other users," because Servat did not "feel that Grindr software works very well," and there would be "times where I'll send a message, and the message will idle. So it won't send right away. And then in the meantime, the user may send other messages. [¶] And so I wanted just to move over to a chat platform that works, in my opinion, very well, one of them being WhatsApp. And so it's just more, just, a functionality reason more than anything else."

On WhatsApp, defendant continued to repeatedly ask for "ass" pictures, and Servat continued to refuse. The two eventually arranged to meet up, near "Nico's" house in San Francisco. When Servat asked, "What u wanna do today?" Defendant replied, "I want that ass." Defendant later asked, "Where we doing it," and Servat stated, "We can go to my place, my mom is at work until 8pm." Defendant asked if it was going to be "[j]ust you" and Servat stated, "Yea just me." They arranged to meet at 3:00 p.m., after Servat stated classes ended at 2:30 p.m.

Defendant asked Servat if his "ass hairy or smooth?" Servat responded, "Smooth." Defendant also asked about Nico's sexual history, and for him to send "your ass pic??" Defendant then once again checked to see if Nico would

4

be "alone when u get home?" Servat informed defendant, his mom would be working. Defendant told Servat, "Maybe I'll fuck u twice then." Servat stated, "Ok but with condom ok," to which defendant replied, "Ok. [¶] I have condom." He next stated, "You're ass better be ready." When defendant was close by he confirmed Servat was near, and sent defendant a map of his location.

Servat was waiting at the designated meeting location and arrested defendant. Servat found a bag in defendant's vehicle containing "condoms and bottle of jelly lubricant." After being *Mirandized*,[3] defendant told Servat he was there to meet someone he met on Grindr. He admitted the person he was talking to told him he was "fifteen or fourteen" and told Servat he had brought condoms and lubricant with him. Defendant stated he knew it was wrong to have sex with minors, to tell minors that he wanted to have sex with them, and to go and meet minors for sex. Defendant additionally admitted to having messaged another minor on Grindr, and that he had met yet another minor in a park months before his arrest and had sex with him.

Servat obtained a "cell phone extraction report" from defendant's conversations with "Nico." Additionally, Servat manually reviewed defendant's Grindr activity to "see all the different chats he was having." The report showed several sexually explicit chats between defendant and other users on Grindr or Snapchat who identified themselves as minors. In one, defendant spoke with a user whose name was " '13 here,' " which led Servat to believe defendant was communicating with a 13 year old. Defendant had sent that user a photo—the same photo he sent to Servat—and asked the user if he wanted to meet. The chat showed defendant made arrangements to meet up with "13 here." That user also stated, " 'I have a friend that's

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

younger that might want to join in on the fun,' " and that the friend was nine years old. Servat found this significant because as one "investigating child exploitation," this implied "there's going to be a younger child involved that's nine, that's obviously very concerning." Throughout the conversation defendant exchanged sexually explicit messages and photos and asked for pictures of the "13 here" user and his nine-year-old friend.

Defendant called one witness, Jesse Huber an investigator for the San Francisco Public Defender's Office. Huber testified that he had been "asked to download the Grindr app and see if it was possible to set up an account if I put my age" as under 18 years old. Huber stated when he picked a birthdate, which made him under the age of 18, the app "stopped me." When he changed his birthdate to make him older than 18 years of age, he was able to create an account.

The jury found defendant guilty of counts 1 and 2.[4] The trial court sentenced defendant to the midterm of two years, but suspended execution of the sentence and placed defendant on probation subject to numerous terms and conditions.

## DISCUSSION

### *Entrapment*

Defendant filed a motion to instruct the jury on entrapment. At the hearing on the motion, defense counsel argued the fact that the profile was titled " 'Nicohere18' " indicated defendant was "speaking with an adult"; that Grindr "is an adult-only website" and caters to "a lot of fantasies . . . with over 100 different categories including the category bear"; and that "31

---

[4] The trial court subsequently granted the People's motion to dismiss count 3, which was a lesser included offense of count 1.

messages and 49 minutes" passed before the "police indicated that the profile is actually 14 years old" were relevant to an entrapment defense.

The prosecution's position was that, although a certain number of messages were exchanged, "it's very early on in the entire context of the conversation that Sergeant Servat—posing as Nico—states that he is actually not 18 but in fact 14," and he followed up by asking defendant, " 'Is that okay with you?' " To which defendant responded, " 'It doesn't matter.' " The two then conversed over a three-day period. These facts, asserted the prosecutor, were similar to those in *People v. Fromuth* (2016) 2 Cal.App.5th 91 (*Fromuth*), in which the court held instruction on entrapment was not warranted.

The trial court agreed the instant case was similar to *Fromuth* and that defendant "himself . . . engaged in contacting underaged minors on the site and in fact had contacted them." Ruling there was no substantial evidence defendant was entrapped in encountering Sergeant Servat, the court refused to give the requested instruction.

Entrapment is an affirmative defense proven by a preponderance of the evidence. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 383.) The test for entrapment is objective and focuses on police conduct (*People v. Watson* (2000) 22 Cal.4th 220, 223), and is established "if the law enforcement conduct is likely to induce a normally law-abiding person to commit the offense." (*Ibid.,* italics omitted; *People v. Barraza* (1979) 23 Cal.3d 675, 689–690 (*Barraza*) [the test for entrapment asks "was the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense?"].) " '[S]uch a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the

suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime.' " (*Watson,* at p. 223, quoting *Barraza*, at p. 690.)

Our Supreme Court has established two guiding principles for assessing whether police conduct amounts to entrapment: "First, if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established. An example of such conduct would be an appeal by the police that would induce a person to commit the act because of friendship or sympathy, instead of a desire for personal gain or other typical criminal purpose. Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment. Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go undetected, an offer of exorbitant consideration, or any similar enticement." (*Barraza, supra*, 23 Cal.3d at p. 690.) The court further explained, "[W]hile the inquiry must focus primarily on the conduct of the law enforcement agent, that conduct is not to be viewed in a vacuum; it should also be judged by the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand. Among the circumstances that may be relevant for this purpose, for example, are the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission." (*Ibid.*)

Defendant maintains that because the evidence showed Grindr is an "adults-only site that requires users to certify they are 18" years of age or

older and to enter a birthdate confirming the user's age; and because Grindr "caters to various fantasies and fetishes," "a normally law-abiding person could easily have believed . . . 'Nico 18 here' was actually 18—and was playing out a 14-year-old fantasy for appellant." Thus, "On these facts," defendant continues, "a juror could reasonably believe that the police conduct made meeting up with a 14 year old to commit a lewd act unusually attractive to a normally law-abiding person."

*Fromuth, supra*, 2 Cal.App.5th 91, on which the trial court relied, is particularly instructive.

In that case, a police officer, as part of an investigation, posted an online advertisement pretending to be a " 'Young cutie looking for a hookup,' " in the " 'casual encounters' " section of Craigslist, a section " 'known . . . for people looking for . . . casual sex.' " (*Fromuth, supra*, 2 Cal.App.5th at p. 96.) The officer left the age blank because the platform would have deleted it if he listed an age younger than 18, as Craigslist "prominently states that ' "by posting here you confirm you're 18 or older." ' " (*Ibid.*) The defendant responded with his picture and information about himself. The officer responded and informed defendant she was only 15 years old. Defendant initially told the officer " 'to stop telling people you're 15 because that makes people worry about if you're actually 15 trying to hook up, or police.' " He then asked if there was " 'something else you can do today besides hook up with someone,' " and if they had another messaging system they could use, like " 'skype or AIM.' " (*Id.* at p. 97)

The officer ceased communicating with the defendant because it was "his protocol . . . to terminate contact if the responder suggested something other than sex," and then took down the advertisement a little later. The defendant once again reached out to the officer, asking about the removed ad,

9

sharing his personal e-mail address, and wishing the user " 'Good luck I hope everything goes okay.' " (*Fromuth, supra*, 2 Cal.App.5th at p. 97.) Several hours later, the officer reached out to the defendant asking if he was " 'still interested?' " The defendant eventually responded he was " 'down,' " and asked, " 'What's the plan?' " (*Ibid.*) Over the next few hours, the two exchanged "a flurry of e-mails," in which the two figured out where to meet, whether defendant would use protection, and other sexual details. (*Id.* at pp. 97–98.) The defendant warned they were both "facing a risky situation" and asked if it was too late for the girl to meet, to which the officer responded, " 'No my mom works nights.' " (*Ibid.*) When defendant arrived at the designated location, he was arrested. (*Id.* at p. 98.)

The Court of Appeal concluded the facts did not support instruction on entrapment, explaining the officer's "conduct would not have induced a *normally law-abiding man* to arrange to have sex with a 15-year-old girl. His conduct did nothing more than present the defendant with the opportunity to commit the offense. '[A] person who steals when given the opportunity is an opportunistic thief, not a normally law-abiding person.' [Citation.] Similarly, a person who arranges to have sex with a child when given the opportunity is an opportunistic sexual predator, not a normally law-abiding person. A normally law-abiding person would not have continued to arrange a 'hookup' after [the officer] revealed that 'Maria' was a 15-year-old girl. Nothing [the officer] did thereafter would have ' "pressure[d]" ' a normally law-abiding man to pursue sex with a 15-year-old girl. An objective examination of [the officer's] conduct reveals no basis for an entrapment defense." (*Fromuth, supra*, 2 Cal.App.5th at p. 111.)

So too here. Sergeant Servat did not badger, cajole, importune, entice, or do anything else that would be likely to induce a normally law-abiding

person to attempt to meet a 14-year-old boy for sex. Servat merely provided defendant with an opportunity to do so. While the posting initially indicated "Nico" was 18 years old, Servat quickly informed defendant he was actually 14 years old. Defendant acknowledged the fictional child's age, stated it did not matter, and continued to ask for sexually explicit pictures, arranged to meet with the boy, asked if they would be alone, arranged to bring condoms, and told the boy what he had planned for him. Nothing about the encounter suggested the two were engaged in any sort of fantasy or fictional role playing. Nor did Servat do anything to make the commission of the crime unusually attractive to a normally law-abiding person. As in *Fromuth,* Sevart's conduct "did nothing more than present defendant with the opportunity to commit the offense." (*Fromuth, supra*, 2 Cal.App.5th at p. 111.)

The trial court did not err in declining to instruct on entrapment.

### *Conduct Credits*

Defendant maintains he is entitled to "20 days presentence conduct credit pursuant to section 4019." (Capitalization & boldface omitted.) The Attorney General agrees.

The concession is well taken.

The trial court sentenced defendant to "seven months in the county jail with credit for having served 21 days." The court stated it would "stay surrender to do the balance of the seven months in lieu of doing 400 hours of community service," and once completed "the seven months will be stayed permanently except for the 21 days you've already served." The court made no mention of conduct credits.

A defendant earns conduct credit at a rate of two days for every two days of presentence custody. (§ 4019; *People v. Chilelli* (2014)

11

225 Cal.App.4th 581, 591.) "The failure to properly calculate custody and conduct credit is a jurisdictional error that can be corrected at any time." (*Id.* at p. 588.)

Here, defendant served 21 days in custody before he was released on electronic monitoring. The probation report notes defendant is entitled to 20 days' conduct credit but the court's minute order makes no mention of the credits. Accordingly, we shall order the minute order modified to reflect that defendant is entitled to 20 days' conduct credit, in addition to 21 days' actual credit, for a total of 41 days' presentence custody credit. (§ 4019.)

## *Probation Conditions*[5]

### *Condition Nos. 22 and 23*

Condition No. 22 provides, The defendant shall obtain prior approval from the probation officer to engage in the following activities: interpersonal communication (chatting, texting, instant messaging, etc.); producing Web content on sites such as, including but not limited to, YouTube, Podcasting, blogging, Facebook, Twitter, Instagram, Grindr and other social networking sites and/or applications ("apps") pertaining to said accounts nor post any ads, either electronic or written; participate in social networking activities; and participating in Internet related telephone communication (including but not limited to Voice Over Internet Protocol).

Condition No. 23 provides, the defendant shall not share any files by any method, (including but not limited to, Peer-to-Peer, Internet Relay Chat, attachments to e-mails, iTunes) without approval by probation.

---

[5] "Generally, we review the [trial] court's imposition of a probation condition for an abuse of discretion. [Citations.] However, we review [facial] constitutional challenges to a probation condition de novo." (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

12

Defendant contends, and the Attorney General agrees, condition Nos. 22 and 23 are unconstitutionally overbroad.

" '[A] probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad.' " (*People v. Olguin* (2008) 45 Cal.4th 375, 384.) " 'The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement.' " (*People v. Pirali* (2013) 217 Cal.App.4th 1341, 1346 (*Pirali*).)

In *People v. Salvador* (2022) 83 Cal.App.5th 57 (*Salvador*), which both parties agree is on point, the Sixth District addressed, among other things, whether two conditions restricting the defendant's social networking and Internet use were constitutionally permissible.[6] (*Salvador,* at p. 65.) The court noted, " 'Restrictions upon access to the Internet necessarily curtail First Amendment rights.' (*In re Stevens* (2004) 119 Cal.App.4th 1228, 1235 . . . (*Stevens*).) ' "The architecture of the Internet, as it is right now, is perhaps the most important model of free speech since the founding [of the

---

[6] As relevant, the conditions in *Salvador* stated, the defendant "shall not knowingly enter any social networking sites, (including but not limited to Facebook, Instagram, Twitter, Snapchat or any other site which the Probation Officer informs him of), or applications pertaining to such accounts, nor post any ads, either electronic or written, unless approved by the Probation Officer" and the defendant "shall not knowingly access the Internet or any other online service through use of a computer, or other electronic device at any location (including his place of employment) without prior approval of the Probation Officer, and he shall not knowingly possess or use any data encryption technique program." (*Salvador, supra,* 83 Cal.App.5th at pp. 60–61.)

Republic]. Two hundred years after the framers ratified the Constitution, the Net has taught us what the First Amendment means. . . . The model for speech that the framers embraced was the model of the Internet— distributed, noncentralized, fully free and diverse." [Citation.] "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." [Citation.]' (*Stevens*, at p. 1236.)" (*Salvador*, at pp. 65–66.) The court concluded the conditions constituted "prior restraints on [the defendant's] ability to engage in communications that would otherwise be protected under the First Amendment." (*Id.* at p. 66.)

In addressing whether this curtailment was unconstitutional, the court discussed two pivotal cases: *Stevens, supra*, 119 Cal.App.4th 1228 and *Pirali, supra*, 217 Cal.App.4th 1341:

"In *Stevens*, the Court of Appeal invalidated a broad prohibition on a parolee's use of the computer and Internet under the First Amendment, holding the condition 'bore no relation to [the parolee's] conviction for child molestation and imposed a greater restriction of his rights than was reasonably necessary to accomplish the state's legitimate goal.' (*Stevens, supra*, 119 Cal.App.4th at p. 1239.)" (*Salvador, supra*, 83 Cal.App.5th at p. 66.)

"In *Pirali*, the defendant was convicted of possession of child pornography on his computer, and the trial court imposed probation conditions substantially similar to the . . . conditions imposed here. We held both conditions were sufficiently narrowly tailored to withstand the defendant's First Amendment challenge. ([*Pirali, supra*, 217 Cal.App.4th] at pp. 1349–1350.) The fact that the defendant could still access social media

14

and the Internet with the prior approval of his probation officer was central to our analysis. (*Id.* at p. 1350.) On that basis, we distinguished the conditions from the parole condition struck down in *Stevens*." (*Salvador, supra*, 83 Cal.App.5th at p. 66.)

The *Salvador* court concluded *Pirali* controlled with respect to the condition restricting the defendant's access to social media sites and upheld the condition. (*Salvador, supra*, 83 Cal.App.5th at p. 66.) However, with respect to the condition that restricted the defendant's "access to the Internet more generally," the court found *Pirali* was distinguishable in three ways: First, there was "nothing in the record that support[ed]" the more general Internet restriction because the "factual nexus was [the defendant's] use of social media to contact the victims, not his access to materials on any other part of the Internet." The general Internet restriction would "thereby sweep[] far more broadly than necessary to serve the purpose of the condition— preventing or deterring contact with minors for sexual purposes." (*Id.* at pp. 66–67.) Second, since the 2013 *Pirali* decision, "the Internet has become even more central and commonplace in the lives of ordinary people; it is now practically unavoidable in daily life." (*Id.* at p. 67.) "No valid purpose," continued the court, "is served by preventing [the defendant] from engaging in the kinds of Internet access that have become common and ubiquitous— e.g., performing work-related tasks, accessing or commenting on news sites, or conducting commercial or business transactions in ways that require engaging in protected speech," and "Access to some part of the Internet is so necessary and frequent as a part of daily life that it may become unduly burdensome to obtain a probation officer's approval for every use of it." (*Ibid.*) Finally, the court noted other imposed conditions "permitting law enforcement to search [the defendant's] electronic devices for communications

15

over social media are adequate to achieve the legitimate purposes of the conditions." (*Ibid.*)

As the Attorney General observes, the social networking (condition No. 22) and the Internet (condition No. 23) conditions at issue here go far beyond those at issue in *Salvador*, in that condition No. 22 prohibits defendant from participating in all "Internet related telephone communication" and condition No. 23 prohibits defendant from sending "any files by any method" without prior approval by a probation officer. They, thus, sweep "too broadly." For instance, continues the Attorney General, under the conditions, if defendant's job involved sending e-mails with attachments, he would need the prior approval of the probation officer before any such e-mail. Here, the factual nexus is defendant's use of social media to contact minors, "not his access to materials on any other part of the Internet." (*Salvador, supra,* 83 Cal.App.5th at p. 67.)

We agree with the Attorney General's observations and therefore conclude portions of both condition Nos. 22 and 23 are unconstitutionally overbroad in violation of defendant's First Amendment rights. We shall remand to allow the trial court to more narrowly tailor the conditions to the legitimate purposes they serve.

*Condition No. 47*

Condition No. 47 provides, the defendant shall not possess at any time any type of pornography, including viewing or possessing child pornography as defined in sections 311.1 and 311.11 of the Penal Code; written pornography, pictures, videotapes, or electronic computer applications or telecommunications access to such applications.

Defendant contends this no-pornography condition is unconstitutionally vague.

16

"The vagueness doctrine bars enforcement of ' "[a probation condition] which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 890; *In re D.H.* (2016) 4 Cal.App.5th 722, 727 (*D.H.*).)

The Attorney General also concedes the no-pornography condition is vague. (See *People v. Gruis* (2023) 94 Cal.App.5th 19, 23 (*Gruis*) [probation condition forbidding defendant from accessing "pornography" is unconstitutionally vague]; *D.H., supra*, 4 Cal.App.5th at pp. 728–729 [same].)

We agree with the observation in *Gruis* that the problem arises because the terms "pornographic" and "pornography," standing alone are subjective and vague. (*Gruis, supra*, 94 Cal.App.5th at p. 24.) Here, however, the probation condition contains a reference to sections 311.11 and 311.1,[7] which collectively define "pornographic." But it does not contain a knowledge

---

[7] Sections 311.11, subdivision (a) and 311.1, subdivision (a) prohibit the knowing possession or control and the knowing sale or distribution of any matter, representation of information, data, or image (e.g., film, photograph, computer-generated image), the production of which involves the use of or depicts "a person under 18 years of age, knowing that the matter depicts a person under 18 years of age personally engaging in or personally simulating sexual conduct, as defined in [section 311.4, subdivision (d)]." (§ 311.11, subd. (a); *Gruis, supra*, 94 Cal.App.5th at p. 25.) In turn, section 311.4, subdivision (d) defines " 'sexual conduct' " as "any of the following, whether actual or simulated: sexual intercourse, oral copulation, anal intercourse, anal oral copulation, masturbation, bestiality, sexual sadism, sexual masochism, penetration of the vagina or rectum by any object in a lewd or lascivious manner, exhibition of the genital or pubic or rectal area for the purpose of sexual stimulation of the viewer, any lewd or lascivious act as defined in Section 288, or excretory functions performed in a lewd or lascivious manner, whether or not any of the above is performed alone or between members of the same or opposite sex or between humans and animals. An act is simulated when it gives the appearance of being sexual conduct." (§ 311.4, subd. (d); *Gruis,* at p. 25.)

17

requirement (*People v. Connors* (2016) 3 Cal.App.5th 729, 738 [upholding modified condition prohibiting possession of sexually explicit materials the " 'probation officer identifies and informs you are sexually explicit' "]) or the " 'primary purpose of causing sexual arousal' " (*In re David C.* (2020) 47 Cal.App.5th 657, 667 (*David C.*) [upholding probation condition prohibiting possession of materials that have " 'primary purpose of causing sexual arousal' "]).

Although we have the power to modify probation conditions to render them constitutional, we decline to do so here. Instead, we remand the matter with directions to the trial court to either strike the no-pornography condition or modify it consistent with the views expressed in this opinion. For example, the court could modify the condition to add in the "primary purpose" or similar phrasing from *David* C. along with the already-included nonsubjective definition of "pornographic" based on sections 311.1, subdivision (a), 311.11, subdivision (a) and 311.4, subdivision (d), which "would distinguish the prohibited materials from those depicting sexual conduct but having primarily literary, artistic, political, or scientific value." (*Gruis, supra*, 94 Cal.App.5th at p. 26 & fn. 4.)

In light of our decision to remand for modification or to strike the condition, we need not and do not consider defendant's challenge to the condition as unconstitutionally overbroad. However, defendant remains free, on remand, to raise any overbreadth objection to any modified condition. (*Gruis, supra*, 94 Cal.App.5th at p. 26 & fn. 5.)

## DISPOSITION

The matter is remanded to allow the trial court to modify probation condition Nos. 22, 23, and 47 consistent with this opinion. We further order the minute order dated January 3, 2023, modified to reflect defendant's

18

entitlement to 21 days' actual credit plus 20 days' conduct credit pursuant to section 4019, for a total of 41 days of presentence custody credit.  The clerk of the Superior Court is directed to prepare a modified minute order stating the correct number of credits.  In all other respects, the judgment is AFFIRMED.

_____
Banke, Acting P. J.

We concur:


_____
Langhorne, J.


_____
Castro, J.*

*Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A