Filed 4/16/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064798 |
| v. | (Super. Ct. No. 20WF1838) |
| JAN CURTIS HARZAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Terri K. Flynn-Peister, Judge. Reversed.

Quinn & Dworakowski and David Dworakowski for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Robin Urbanski, Donald W. Ostertag and Flavio Nominati, Deputy Attorneys General, for Plaintiff and Appellant.

Over a nine-day period in 2020, defendant Jan Curtis Harzan, then age 65, exchanged sexually explicit electronic messages with an undercover police detective whom he believed was a 13-year-old girl named Brianna. At Harzan's trial for communicating with and arranging to meet a minor with the intent to commit a sexual offense, the trial court ruled there was sufficient evidence to support jury instructions on the defense of entrapment. However, the court ruled that if Harzan decided to pursue that defense, it would allow the prosecution to introduce evidence Harzan had engaged in sexual misconduct nearly 50 years earlier, when he was in his teens. To prevent the jury from hearing that highly prejudicial evidence, Harzan surrendered his right to present an entrapment defense, and he ultimately was convicted as charged.

On appeal, Harzan contends: (1) the trial court should have excluded the prior misconduct evidence altogether, irrespective of the entrapment issue, and its failure to do so violated his constitutional right to present a defense; and (2) there is insufficient evidence to support his convictions. Although we find Harzan's convictions are supported by substantial evidence, we conclude the trial court prejudicially violated Harzan's constitutional rights by requiring him to give up his entrapment defense in order to keep his prior sexual misconduct out of evidence. We therefore reverse the judgment.

STATEMENT OF FACTS

In May 2020, Harzan posted an ad on Craigslist under a category called "Missed Connections." Entitled "Missing my young friend," the ad stated: "GL older M here looking to find my young coed friend I use[d] to hang out with. We would have such good times together. Is that you?"

Harzan's ad caught the attention of Huntington Beach Vice Detective Joseph Baugh, who specializes in internet-related crimes against children. Baugh believed the ad's repeated use of the word "young" indicated the person posting it might be trying to contact minors for illicit purposes. So, on June 25, 2020, he responded to the post using an undercover email account.

Pretending to be a girl named "Brianna," Baugh asked Harzan what "GL" meant and what he did for fun. Harzan replied: "GL means 'Good Looking' which is of course in the eye of the beholder. LOL I am looking for a fun little playmate and someone I can mentor. What are you looking for? Do you have a pic? Yours gets mine." "Brianna" did not respond to that message.

The next day, Harzan emailed a photograph of himself to "Brianna," along with the following message: "Would you like to talk? I can give you my cell number or we could meet somewhere and talk. A pic would be nice. Here's mine. I'm available all afternoon today." When "Brianna" did not reply, Harzan sent her several follow-up messages, saying he was generous and asking if she would like to meet. Still, she did not reply until four days later, on June 30, 2020.

That day, the following email exchange occurred between "Brianna" and Harzan:[1]

"[Brianna:] im only 13 so im pretty inexperienced...but wouldlike to get some from someone that knows what to do lol.

"[Harzan:] I am more than happy to talk with you, but honestly you are only 13 and therefore underage so sex is out of the question. I would

---

[1] The exchanges between "Brianna" and Harzan are reproduced largely as is, with abbreviations and grammatical errors intact, to accurately reflect the nature of their conversations.

focus on your school work and getting a good education at this point and forget about sex until you are at least 18. Always happy to talk with you about life, boys, school, careers, and anything else on your mind. You sound like a very sharp and intelligent young lady. Let me know if you would like this type of mentoring support.

"[Brianna:] ur so sweet,,,but I have enough friends to talk with, thk u tho

"[Harzan:] Would you be sweet enough to share a picture of yourself?

"[Brianna:] why would u want a pic of me,,,u basically just said u didnt want to do anything lol and how do I kno ur not gonna spread my pic everywhere??

"[Harzan:] I promise I would never do that.

"[Brianna:] but i dnt know that....im 13 but im not a dumb girl. id have to get to know you before sending pics...and u already said i was to young for u

"[Harzan:] Well, we better meet then. When are you avail."

At that point, "Brianna" reiterated she already had enough friends. But she gave Harzan a phone number and told him he could text her if he wanted to.

A couple of minutes later, Harzan sent "Brianna" a text message, asking if she used Signal or WhatsApp, which are encrypted messaging apps that have heightened privacy protections. "Brianna" said she used to use WhatsApp, but her parents made her delete it. In response to Harzan's inquiry about what she liked to do, she said she was into "all sorts of things" and wanted to "try some different stuff," as well.

"Brianna" then asked Harzan what his initial post was about, which led to the following exchange:

"[Harzan:] I like teaching young ladies like yourself about life

"[Harzan:] Sex for sure.

"[Brianna:] like what

"[Brianna:] mmmm

"[Brianna:] im interested,,

"[Brianna:] how do uteach

"[Harzan:] But other things as well if you're up for it.

"[Harzan:] We would need to meet and talk about it

"[Brianna:] id wanna kno what im getting myself into,,,,but im for sure down for stuff

"[Harzan:] I prefer hands on teaching to be honest

"[Brianna:] Ill be honest with u,,,ive never gone all the way with a guy

"[Harzan:] But nothing would happen without your consent

"[Brianna:] have done pretty muvh everything else

"[Brianna:] well if ur nice and not an asshle when we meet up,,,like I said

"[Brianna:] im down

"[Harzan:] I am very nice and respectful

"[Harzan:] Okay then. When would you like to get started"

The two then began discussing the logistics of getting together. When "Brianna" asked how long their first meeting would be, Harzan told her, "One hour maybe. Or two. Could be shorter if you like." "Brianna" replied "an hour? that's it......i don't kno if id want my first time being a

complete rush" "im not really sure how this woud go" "was hoping u would kno and show me lol."

Harzan texted back: "How about I swing by tomorrow or Thursday and we meet face to face. If you like what you see we will set up time on Friday. Several hours for training and taking it slow." "Or you tell me what your dream would be and I'll make it come into being. It sounds like you're ready to move to the next step." When "Brianna" asked Harzan what they would do, he told her, "I have some ideas." "Dream your vision tonight and let's talk about it tomorrow." He then encouraged "Brianna" to delete their conversation and said he would do the same.

The following morning, July 1, 2020, "Brianna" texted Harzan saying, "i was up all night thinking about u" "u r very handsome btw [smiling emoji]" She asked Harzan, "[I]f we were to have sex,,, would it be likein a hotel?" Harzan answered, "Yes or my office." "Brianna" told Harzan she wanted to have sex but not get pregnant. When she asked Harzan about birth control, he said condoms used with foam were the best way to prevent pregnancy. That led to further discussions about their prospective encounter:

"[Brianna:] will u get whatever [birth control] u think is best if we decide today is the day??"

"[Brianna:] i dont thnk I can get that stuff without it looking sketchy

"[Harzan:] Yes

"[Harzan:] I'll do that

"[Brianna:] last dumb question,,,[¶] . . . [¶] . . . because ur older than me,,,will it hurt more because urs is probably bigger than boys my age?

"[¶] . . . [¶]

6

"[Harzan:] It could. The trick is to go slow and work up from there

"[Harzan:] Stretch you out as it were

"[Brianna:] Wat do u mean as it were? [¶] . . . How do you stretch a vagina…that sounds terrible lol [¶] . . . or not....

"[Harzan:] Very slowly and carefully. It is built to stretch and expand. Where do you think babies arrive from?

"[Harzan:] It's built to handle different sizes of penises

"[Harzan:] [Eggplant emoji]"

Harzan then asked "Brianna" about her prior sexual experiences and whether she had ever had an orgasm. She said she had a few sexual encounters with boys her age but had never gone "all the way" or had an orgasm. Harzan then told her, "I can make you orgasm by licking you, or by fingering you while I lick." "There is the Gspot inside your vagina that gives you the best orgasms. One has to hit it." "Brianna" responded, "gotcha" "ok now im excited" "lol."

About half an hour later, "Brianna" messaged Harzan saying "if we are planning on doin this today lemme kno" because I "have to start tellin my parents something" as an excuse to get out of the house. Harzan suggested they meet in two days, on Friday July 3, 2020. He also asked "Brianna" if she would be willing to send him a picture of herself. She said she preferred not to, but if things went well when they met, he could have all the pictures he wanted.

Harzan later asked "Brianna" why she wanted to lose her virginity so badly. When she replied she wanted her first time to be with someone who knew what he was doing, Harzan said, "I can teach you alot." "Brianna" told Harzan "im ready" and asked about his previous sexual

encounters. Harzan said he had never had sex with someone as young as "Brianna," and his first sexual encounter—with "an older married woman" when he was 17 years old—was not very good. He also told "Brianna" sex is more pleasurable when "you're doing it with someone who" "you're attracted to," to which "Brianna" replied "well at least i got that going [kissing emoji]." When "Brianna" asked where they were going to "do it," Harzan said he had a comfy blanket in his office that they could lay on, and she replied "ok."

More texting ensued the following day, July 2, 2020. "Brianna" told Harzan her parents had given her permission to go to her friend's house the next day, to which Harzan replied, "Great!" He then sent "Brianna" a long message that read:

"Brianna, I want to encourage you to consider 5 reasons NOT to have intercourse before you are over 16. Preferably 17 or 18. Here they are; 1. Boys will always want to sleep with you that is how they are genetically wired. Your not having sex (intercourse) with them only makes them want you more. You already know how to satisfy their desires without having intercourse. Trust me they will respect you more. 2. When you have intercourse with someone we are wired to want to bond with that person. The more partners one has the less and less the stickiness for bonding occurs. This can create potential problems when you get married and want to bond with your mate. It's a chemical thing. You do not want to 'lose' your stickiness for bonding. 3. Once you begin sexual intercourse you turn on your biological internal clock and begin aging faster. Girls who hold off tend to blossom later and age at a slower rate. 4. Once you start you are going to want it all the time. You will live 100 years at your current age. What's holding off 3 or 4 more years? Thats 84 years of sex ahead of you. 5. Finally, the usual issues of

8

pregnancy and or disease that can come with promiscuity. Please give these points careful consideration."

That led to the following exchange:

"[Brianna:] i dont understand..

"[Brianna:] u could have just said u didnt want to meeet with me

"[Brianna:] im not forcing u to do anything

"[Harzan:] I do want to meet you

"[Brianna:] u didmnt have to be ,mean about it

"[Brianna:] Im not stupid and have thought about all that

"[Brianna:] Its MY choice

"[Brianna:] not urs or anyone elses

"[Harzan:] I'm not being mean. I just want to make sure you've thought it all the way through

"[Brianna:] so what are u saying?

"[Harzan:] You decision"

"Brianna" then told Harzan, "i truly feel like u dont really want to have sex with me anymore, which isn't how I wanted to feel for my first time." "[P]lease let me know if you still want to meet me, and if you are still good with having sex with me, i want to know that you WANT to, just let me kno either way." Harzan replied, "I cannot because it is illegal for me to do so. Believe me I WANT to. Let's talk tomorrow." "Brianna" told Harzan she was confused and would talk to him later.

The next day, "Brianna" messaged Harzan saying she still wanted to have sex with him, but she wanted to know if the feeling was mutual. Harzan replied, "I really really really want to, but i also really really really don't want to go to jail. [Frowning emoji] A call would be nice."

9

At that point, Detective Baugh had a female undercover police officer call Harzan, pretending to be "Brianna." During the call, the following exchange occurred:

"[Brianna]: So are we going to meet up or something? Because I told my mom I have soccer practice at 2:00.

"[Harzan]: Oh, gosh.

"[Brianna]: Because like, you know, it seems like you don't really want to, and I thought this was like for sure.

"[Harzan]: Well, look. I really, really want to. The problem is I'm the one who takes the risk because if anyone finds out we did this, I am hosed, I'm screwed. That's the thing I'm concerned about, so—

"[Brianna]: But, like, no one will know and it will just be us.

"[Harzan]: Yeah. And then what? If you tell a girlfriend or you tell a friend at school, I'm—and it gets back, then I'm the one who is going to be damaged. Not you. I mean, I'm going to be—look, I really, really want to do it. I mean, honestly. I mean, trust me. I want to help—I want to help you do this. I'm just nervous about—

"[Brianna]: Well, I don't—well, I don't have a lot of friends at school anyways so I wouldn't tell anyone. And, like, I've been talking to you for a while now. I thought like—like—

"[Harzan]: Okay.

"[Brianna]: I thought we had something special here. And, like, I don't even like the guys my age or anything so I thought this would be nice.

"[Harzan]: Why? Is this a one-time deal? Is that what we're doing or were you thinking of something more?

"[Brianna]: I don't—well, I don't know. Whatever you want to do, but I just really want to lose my virginity already. It feels like all the girls in my class have already done it.

"[Harzan]: Wow. I doubt they have. They're probably just talking big. Seriously. You think they all have? I don't think so. I don't think—

"[Brianna]: Well, yeah.

"[Harzan]: Is that—is that what's driving you is you want to—you don't want to—you want to be like the other girls that you've done it?

"[Brianna]: Well, kind of, but I want it to be like, I don't know, better.

"[Harzan]: Uh-huh. How better?

"[Brianna]: Well, okay. Well, my mom is calling me. She wants to know if I'm actually going to go out or not. So I got to go. I'm going to text you. Okay?

"[Harzan]: Okay. Thanks, Brianna."

Pretending to be "Brianna," Detective Baugh then started texting with Harzan again:

"[Brianna:] are we doing this or not?

"[Brianna:] i dont know what else i can do to make u want to

"[Harzan:] How about we meet and talk and see where things go from there

"[Brianna:] i told u I don't need friends

"[Brianna:] i wanted to have sex with u,,,,but its kinda ovbious u dont anymore

"[Harzan:] Tell me when and where and I'll be there

"[Brianna:] u promise?

"[Harzan:] Y

"[Brianna:] [Smiling hearts emoji]"

Harzan and "Brianna" then made arrangements to meet at a fast food restaurant in Huntington Beach later that day. When Harzan arrived at the restaurant, the police arrested him and took him into custody. Harzan did not have any condoms in his possession, but he had already deleted about 70 percent of his text messages with "Brianna" by that time.

Harzan was charged with one count of communicating with a minor with the intent to commit a sexual offense and one count of arranging to meet a minor with the intent to commit a sexual offense. (Pen. Code, §§ 288.3 & 288.4.)[2] Before trial, the prosecution moved to admit evidence that Harzan had sexually molested his younger sister and her friend when he was in his teens, back in the early 1970s. The trial court ruled the evidence could not be admitted in the prosecution's case-in-chief, but if Harzan was going to raise the defense of entrapment, the prosecution could introduce the evidence to rebut that defense.

Harzan ended up foregoing an entrapment defense, and he did not present any evidence in his defense. In closing argument, defense counsel argued Harzan did not have the intent to have sex with "Brianna" when he was communicating with and arranging to meet her. However, the jury convicted Harzan as charged, and the trial court sentenced him to two years in prison for his crimes.

---

[2] These crimes do not require the prosecution to prove the purported victim is a real person; they simply require proof the defendant believed the victim was real. (See Pen. Code, § 288.4, subd. (a)(1); *People v. Korwin* (2019) 36 Cal.App.5th 682 [it was no defense under Penal Code section 288.3 that the teenage girl the defendant thought he was communicating with was actually an adult undercover police officer].)

# DISCUSSION

## I.

### THE PRIOR SEXUAL MISCONDUCT EVIDENCE

Harzan contends the trial court erred in ruling the prosecution could admit evidence of his prior sexual misconduct if he raised an entrapment defense. Harzan argues the misconduct evidence should have been categorically excluded as unduly prejudicial and, by conditioning its exclusion on him giving up an entrapment defense, the court infringed his constitutional right to present a defense. The Attorney General asserts the court's ruling is nonreviewable because the misconduct evidence was never admitted at trial and, in any event, the ruling was within the court's discretion and constitutionally sound. For the reasons explained below, we conclude the court committed prejudicial error by allowing the prosecution to introduce evidence of Harzan's prior sexual misconduct if he did not relinquish his right to assert the defense of entrapment.

### A. Factual Background

In their trial briefs, the parties laid out the communications between Harzan and "Brianna" and set forth their respective positions on the admissibility of Harzan's prior sexual misconduct. According to the prosecutor, that misconduct came to light after the Huntington Beach Police Department posted about Harzan's arrest on its Facebook page. In response to the post, Harzan's sister (Jane Doe #1) reached out to the department and reported Harzan had molested her one time when she was about six years old and Harzan was about sixteen. She said the incident occurred in the garage of their family home. Harzan pulled down his pants, exposing his erect penis, and told her to put it in her mouth like "a lollipop." She did as told, orally copulating Harzan for a brief period. Afterwards, she did not tell anyone

13

about the incident, but she did bring it up to Harzan years later, when they were adults. Harzan told her he was sorry, wrote her an apology, and offered to go to therapy with her to help her work through it.

In addition to revealing her own abuse, Jane Doe #1 told the police Harzan may also have victimized her childhood friend, Jane Doe #2, so the police interviewed her, as well. Jane Doe #2 alleged Harzan molested her one day when she was about eight or nine years old and he was about 18. She had gone over to Harzan's house to play with Jane Doe #1 that day, and when she went into Harzan's room to retrieve a toy, he orally copulated her and offered her a dollar to lick his penis. When she refused, Harzan rubbed his erect penis against her vagina, but he did not penetrate her. At one point during the encounter, Jane Doe #1 opened the door, saw what was going on, and quickly ran away. After that, Harzan made a comment that made Jane Doe #2 think he might have molested Jane Doe #1, too.

The prosecutor contended this evidence was admissible under Evidence Code section 1108 to show Harzan's propensity to commit the charged offenses.[3] Alternatively, the prosecutor argued the evidence was admissible under section 1101, subdivision (b) to show Harzan's intent and absence of mistake.

Defense counsel objected to admitting the evidence of Harzan's prior sexual misconduct, arguing, among other things, it was unduly prejudicial under section 352. Defense counsel also informed the trial court he would be seeking instructions on entrapment because, in communicating with Harzan, Detective Baugh (under the guise of "Brianna") engaged in "a

---

[3] Unless noted otherwise, all further statutory references are to the Evidence Code.

14

pattern of persistent badgering, cajoling, and importuning . . . which was likely to induce a normally law-abiding person to commit" the charged offenses. (Capitalization omitted.)

The trial court conducted a lengthy hearing on these issues. At the outset, the court determined there was sufficient evidence to warrant instructions on the defense of entrapment, based on the transcripts of the messages between Harzan and "Brianna."

The trial court then turned to the prosecution's motion to introduce evidence of Harzan's prior sexual misconduct. The court ruled the evidence was not admissible under section 1108 because Harzan was not charged with a sexual offense as defined in subdivision (d)(1) of that statute. It also ruled that, for purposes of section 1101, subdivision (b), the evidence was not admissible in the prosecution's case-in-chief because it was unduly prejudicial under section 352. In fact, the court determined it would be fundamentally unfair to allow the prosecution to admit the evidence because Harzan's prior sexual misconduct was "very, very old and very, very different than the conduct we're looking at in this case."

However, the trial court believed the calculus would change if Harzan raised an entrapment defense and requested instructions on that theory. In that event, said the court, "the People [would] then have the burden of proving the defendant was not entrapped." And to meet that burden, the prosecution could admit the evidence of Harzan's prior sexual misconduct to show he had the motive and intent to commit the charged offenses.

Defense counsel challenged the trial court's reasoning by pointing to the wording of CALCRIM No. 3408, the standard jury instruction on entrapment. That instruction states, "The defendant has the burden of

15

proving the defense [of entrapment] by a preponderance of the evidence." (CALCRIM No. 3408.) The instruction also makes clear the test for determining whether a person has been entrapped is an objective one. That is, whether the police "engaged in conduct that would cause a normally law-abiding person to commit the [charged] crime" under the circumstances presented. (*Ibid*.) Therefore, CALCRIM No. 3408 specifically states the jury may not consider the defendant's "particular intentions or character, or whether [he] had a predisposition to commit the crime." (*Ibid*.) Because the focus of the entrapment defense is on the conduct of the police, defense counsel argued Harzan's prior sexual misconduct was not relevant to whether he was entrapped by Detective Baugh.

The trial court disagreed. Although it stated it never liked "to put a defense attorney in a position where they can't do their defense," the court stood by its decision to allow the prosecution to introduce evidence of Harzan's prior sexual misconduct if he raised the defense of entrapment. Faced with that prospect, defense counsel informed the court he would not be seeking instructions on that defense. Counsel explained, "I am not requesting the entrapment instruction in order to avoid the possibility of the introduction of these other actions as a bootstrap way to get into the prior conduct."[4]

---

[4] In addition to allowing the prosecution to present evidence of Harzan's prior sexual misconduct to prove his motive and intent if he raised an entrapment defense, the trial court separately ruled the prosecution could use that evidence to impeach Harzan's credibility if he testified during the trial. Harzan's appeal is limited to the first issue; he does not challenge the court's ruling on the impeachment issue.

16

## B. The Trial Court's Ruling Is Reviewable

As a preliminary matter, the Attorney General contends Harzan is procedurally barred from challenging the trial court's decision to permit the prosecution to introduce evidence of his prior sexual misconduct if he raised an entrapment defense. Because Harzan did not raise the defense and the misconduct evidence was never admitted, the Attorney General argues Harzan failed to preserve the issue for appellate review.

In so arguing, the Attorney General relies on the rule that, to challenge a pretrial ruling allowing the prosecution to impeach the defendant with evidence of a prior conviction, the defendant must actually take the stand and suffer the impeachment. (*Luce v. United States* (1984) 469 U.S. 38; *People v. Collins* (1986) 42 Cal.3d 378). The rationale for the rule is threefold:

"First, in order to determine the admissibility of [the impeachment evidence], the court must balance its probative value against its prejudicial effect under . . . section 352, an analysis that cannot be performed unless the record discloses the content of the defendant's testimony. [Citations.] Second, if the defendant does not testify, any possible harm from the trial court's ruling is wholly speculative. The ruling might change in response to the actual content of the defendant's testimony, or the prosecution might choose not to use the evidence at issue. [Citations.] Third, if the trial court erred in its ruling, the appellate court could not 'intelligently weigh the prejudicial affect [sic] of that error.'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 731–732.)

These three points underscore the core concern when the defendant fails to testify and suffer impeachment by virtue of a prior conviction. In that situation, there is an insufficient factual record to determine whether the impeachment evidence was admissible and how it

would have impacted the defendant's case in terms of prejudice. (*Luce v. United States, supra*, 469 U.S. at p. 43 [the defendant's testimony provides the necessary factual context to permit meaningful review]; *People v. Collins, supra*, 42 Cal.3d at p. 384 [same].)

But, in this case, Harzan is not arguing the trial court's decision to allow the prosecution to use the evidence of his prior sexual misconduct infringed his constitutional right to testify. (See *supra*, p. 16, fn. 4.) Rather, he is arguing the ruling infringed his constitutional right to present a defense that the trial court had already deemed factually viable. Although we do not know what Harzan would have said had he taken the stand at trial, the facts pertaining to his entrapment defense are largely undisputed.

Those facts arose from the communications between Harzan and "Brianna," which were set forth at length in the parties' trial briefs. So was the evidence pertaining to Harzan's alleged prior sexual misconduct. There was no secret what the victims of that misconduct were going to say at trial if Harzan had opted to raise the defense of entrapment. Under these circumstances, there is a sufficient factual basis to review the propriety and prejudicial effect of the trial court's ruling regarding that evidence. Thus, Harzan's challenge to that ruling is not procedurally barred.

*C. The Trial Court's Ruling Was Erroneous and Prejudicially Violated Harzan's Right to Present a Defense*

Relying on section 1101, subdivision (b), the Attorney General asserts the trial court properly ruled the evidence of Harzan's prior sexual

misconduct would be admissible if he raised an entrapment defense.[5] We disagree.

Under section 1101, evidence of a defendant's prior uncharged misconduct generally is inadmissible to prove his conduct on a specific occasion or his propensity for criminal activity. (*Id.*, subd. (a).) However, such evidence may be admitted to prove a material fact in the case, such as motive, intent, or absence of mistake. (*Id.*, subd. (b).) Factors bearing on admissibility include the relevance of the particular fact to be proven and whether the evidence would be unduly prejudicial under section 352. (*People v. Roldan* (2005) 35 Cal.4th 646, 705, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Courts must keep in mind that "[e]vidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.'" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.)

Here, the trial court determined that for purposes of proving the charged offenses, the evidence of Harzan's prior sexual misconduct was "highly prejudicial" and "unfair" because the misconduct occurred roughly half a century ago and was "very different" from what he was accused of doing in this case. Therefore, the prosecution could not use that evidence in its case-in-chief.

That evidence would not have become any less prejudicial if Harzan had raised an entrapment defense. Nevertheless, the trial court

---

[5] The Attorney General does not dispute the trial court's ruling that the evidence was inadmissible for purposes of section 1108.

believed that with an entrapment defense in play, the probative value of the evidence would increase, thereby tipping the scales in favor of admission. This conclusion was informed by the court's understanding that evidence of Harzan's state of mind was relevant to rebut a claim of entrapment.

As defense counsel pointed out below, however, entrapment turns on whether the police conduct at issue would have caused a normally law-abiding person to commit the charged offenses; it does not depend on what the particular defendant was thinking when he committed the acts in question. The California Supreme Court made this clear many years ago, in *People v. Barraza* (1979) 23 Cal.3d 675 (*Barraza*).

Tracing the historical development of the law on entrapment, *Barraza* recognized the traditional test for entrapment is based on a subjective standard that focuses on the defendant's state of mind: If the defendant had a preexisting intent or disposition to commit the charged offense, he may be found guilty even if the police overstepped the bounds of permissible investigative conduct. (*Barraza, supra*, 23 Cal.3d at pp. 686–689.) *Barraza* also acknowledged the subjective standard for entrapment is used in the federal courts and in the vast majority of states. (*Id.* at pp. 686–689 & p. 692 (concur. and dissent. opn. of Richardson, J.); see also Roiphe, *The Serpent Beguiled Me: A History of the Entrapment Defense* (2003) 33 Seton Hall L.Rev. 257, 258.)

In *Barraza*, however, our Supreme Court took a different approach to the issue and adopted an objective standard for determining whether a defendant has been entrapped. As set forth in *Barraza*, "[T]he proper test of entrapment in California is [whether] the conduct of the law enforcement agent [was] likely to induce a normally law-abiding person to commit the offense[.] For the purposes of this test, we presume that such a

person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime." (*Barraza, supra*, 23 Cal.3d at pp. 689–690, fn. omitted.)

Under this standard, entrapment may be established if the police induce a normally law-abiding person to commit a crime "because of friendship or sympathy, instead of a desire for personal gain or other typical criminal purpose." (*Barraza, supra*, 23 Cal.3d at p. 690.) Or entrapment may be established if the police make the crime unusually attractive to such a person by promising the act is not illegal or the offense will go undetected. (*Ibid*.)

"[W]hile the inquiry must focus primarily on the conduct of the law enforcement agent, that conduct is not to be viewed in a vacuum; it should also be judged by the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand. Among the circumstances that may be relevant for this purpose, for example, are the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission. [Citation.] . . . *[H]owever, . . . such matters as the character of the suspect, his predisposition to commit the offense, and his subjective intent are irrelevant*." (*Barraza, supra,* 23 Cal.3d at pp. 690–691, italics added.)

That being the case, the trial court's conclusion that an entrapment defense would open the door to Harzan's prior misconduct evidence bearing on his motive and intent was incorrect. Contrary to the trial court's understanding, those issues regarding Harzan's subjective state of mind were not relevant to whether Detective Baugh's actions would cause a normally law-abiding person to commit the offenses at issue here.

In arguing otherwise, the Attorney General relies on *People v. Foster* (1974) 36 Cal.App.3d 594, which upheld the admission of the defendant's prior criminal acts on the theory they were relevant to defeat his entrapment defense by showing his predisposition to commit the charged offense. (*Id.* at pp. 596–599.) In so doing, however, *Foster* applied the subjective standard of entrapment that was disapproved five years later in *Barraza*. (*Foster* at pp. 596–597.) Although evidence of the defendant's prior criminal activity may be admitted to refute a claim of entrapment under the subjective standard, *Barraza* makes clear such evidence is inadmissible under the objective standard of entrapment the court articulated in that case. (*Barraza, supra*, 23 Cal.3d at pp. 688–691.) The *Foster* decision is thus of no aid to the Attorney General here.[6]

Even so, the Attorney General contends the trial court's ruling did not violate Harzan's right to present a defense because he voluntarily chose to surrender his entrapment defense to avoid the introduction of the prior sexual misconduct evidence. According to the Attorney General, that choice was no different than any other strategic decision criminal defendants

_____

[6] The Attorney General also cites *Foster* for the proposition that the defendant must admit committing the charged crimes in order to raise an entrapment defense. That, too, is incorrect. (*Barraza, supra*, 23 Cal.3d at pp. 691–692.)

are called upon to make during the trial process, such as whether to present favorable evidence that might permit the introduction of unfavorable evidence.[7]

As we explained above, however, the choice Harzan was presented here—to either abandon a factually-supported entrapment defense or suffer the introduction of highly prejudicial prior misconduct evidence— was based on the trial court's legal misunderstanding of the entrapment defense. Because Harzan should never have been put to that choice, we reject the Attorney General's claim that he voluntarily surrendered his right to present an entrapment defense. (See *Holmes v. South Carolina* (2006) 547 U.S. 319 [absent a valid justification, the state cannot impede a defendant's constitutional right to present a defense]; *Crane v. Kentucky* (1986) 476 U.S. 683 [same].)

Having determined the trial court violated Harzan's right to present a defense, we turn to the issue of prejudice. We must decide whether that violation was harmless beyond a reasonable doubt on the record before us. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 23 [assuming a violation of a criminal defendant's right to present a defense is reviewed under the harmless-beyond-a-reasonable-doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18]; *People v. Ahmed* (2018) 25 Cal.App.5th 136, 138 [applying the *Chapman* standard in deciding whether the trial court's failure to instruct on an affirmative defense was prejudicial]; *People v. Mulcrevy* (2014) 233 Cal.App.4th 127, 131 [same].) That is a demanding standard: Reversal is required unless the failure to instruct on entrapment

---

[7] For example, if the defense introduces evidence the defendant has a good character that is inconsistent with the charged crimes, the prosecution can introduce bad character evidence to rebut it. (§ 1102.)

was so unimportant and insignificant to the case that there is no reasonable possibility it might have contributed to the jury's guilty verdict. (*Chapman, supra*, 386 U.S. at p. 24; *People v. Aranda* (2012) 55 Cal.4th 342, 367.)

According to Harzan's Craigslist ad, he was seeking a "young coed friend" to have "good times" with. And after "Brianna" contacted him, he made it clear he was interested in having sex with her, even though she told him she was only 13 years old. But Harzan also repeatedly told "Brianna" that, as much as he wanted to have sex with her, he could not do so because she was a minor. As defense counsel pointed out in closing argument, there is a difference between wanting to commit a crime and actually carrying it out. Our criminal law prohibits the latter but not the former.

More important, every time Harzan told "Brianna" he could not have sex with her, she expressed disappointment and tried to convince him to change his mind by using sympathy and guilt. In addition, "Brianna" assured Harzan he would not get caught because she would not tell anyone if they did have sex. These techniques were cited in *Barraza* as examples of possible police overreach. (*Barraza, supra*, 23 Cal.3d at p. 690.) Although there is no way of knowing whether an entrapment defense would have succeeded at Harzan's trial, we cannot conclude the failure to instruct on that defense was harmless beyond a reasonable doubt. Therefore, Harzan's convictions cannot stand.

## II.

### THE SUFFICIENCY OF THE EVIDENCE

Although the judgment must be reversed due to the evidentiary error discussed above, we do not believe the evidence was insufficient to support the jury's verdict, so as to preclude the prosecution from retrying Harzan, if it chooses to do so. Harzan maintains there is insufficient evidence

24

he acted with the requisite intent to commit a sexual offense with "Brianna." The record shows otherwise.

*A. Standard of Review*

In assessing the sufficiency of the evidence to support a criminal conviction, we "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We do not reweigh the evidence or reevaluate the credibility of the trial witnesses; rather, "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Ibid*.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it]."'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508; accord, *People v. Montanez* (2023) 91 Cal.App.5th 245, 270.)

*B. Analysis*

Under this deferential standard, it does not matter that Harzan sent "Brianna" mixed messages about his intentions. The facts that he repeatedly told her he wanted to have sex with her and then drove to the place he had arranged to meet her is sufficient to support his convictions. Based on that evidence alone, a reasonable jury could find Harzan harbored the intent to commit a sexual offense with "Brianna."

In his defense, Harzan points out he did not have any condoms in his possession when he showed up to meet "Brianna." However, that fact is

25

not determinative because the mens rea required for the charged crimes is the intent to commit a sexual offense with a minor, which would include any lewd touching. The prosecution was not required to prove Harzan intended to have sexual intercourse with "Brianna." (See Pen. Code, §§ 288.3, subd. (a) [prohibiting communicating with a minor with the intent to violate Penal Code section 288, which makes it a felony to commit a lewd act on a child under the age of 14] & 288.4, subd. (a)(1) [prohibiting arranging to meet a minor for the purpose of engaging in lewd behavior].)

All things considered, there is substantial evidence from which the jury could infer Harzan intended to commit a sexual offense with a minor when he was communicating with and arranging to meet "Brianna." The fact there is sufficient evidence to justify a contrary conclusion does not change this result. (*People v. Holt* (1997) 15 Cal.4th 619, 669.) Because the evidence was legally sufficient to support the jury's verdict, there is no bar to retrial. (*Lockhart v. Nelson* (1988) 488 U.S. 33, 38–40.)[8]

---

[8] Harzan also contends Detective Baugh's testimony exceeded the permissible scope of a pretrial ruling and expert testimony generally. Because we are reversing on other grounds, and because the testimony is likely to play out differently in the event the case is retried, we need not address these issues.

26

DISPOSITION

The judgment is reversed.

GOODING, J.

WE CONCUR:

MOORE, ACTING P. J.

SANCHEZ, J.